BARNES v. BOYD et al.—72 S. W. (2d) 573.

Middle Section. February 17, 1934.

Petition for Certiorari denied by the Supreme Court, June 23, 1934.

W. Raymond Denny, of Nashville, for complainant.

Bond, Fuqua & Bond and Wm. D. Dodson, all of Nashville, **for** Donelson Bank & Trust Co.

DeWITT, J. The complainant, as administratrix of the estate of her husband, W. F. Barnes, filed the original and amended bills in this cause against T. B. Boyd and his wife, Mrs. Lucy Neil Boyd, his sister, Bessie L. Boyd, and W. C. Dodson, Jr., trustee for the Donelson Bank & Trust Company, for the purpose of enforcing a vendor's lien upon a tract of 1,985 acres of land, for the satisfaction of two notes for $100 each, and interest, executed by T. B. Boyd and Bessie L. Boyd on June 5, 1923, due respectively in five and six years after said date.

The tract of land was purchased by T. B. Boyd and Miss Bessie L. Boyd on June 5, 1923, from W. F. Barnes and his wife for $750, of which $150 was paid in cash and for the balance Mr. Boyd and his sister gave their six notes for $100 each, secured by lien expressly retained in the deed. The first four of these notes have been paid and the makers of the notes sued on admit their liability thereon. W. F. Barnes, the payee, died intestate on December 24, 1928, and at the time of his death he was the owner and holder of these notes. In this cause a decree pro confesso was taken against Mr. and Mrs. Boyd and Miss Boyd. The sole issue is as to priority between the lien of these notes and a deed of trust of T. B. Boyd and his wife to W. C. Dodson, Jr., trustee, to one-half of this property, executed on October 29, 1927, to secure the payment of their note for $750 and interest, payable to the order of the Donelson Bank & Trust Company, which is still the owner and holder of said note and security.

The vendor's lien, of course, antedates the deed of trust; but the claim of the Donelson Bank & Trust Company in its answer is that it loaned the sum of $750 to Mr. Boyd upon the security of said deed of trust upon faith of an agreement made by the deceased, W. F. Barnes, to release the lien of these two notes as to one-half of this land; and that the widow and administratrix of Mr. Barnes, being in privity with him, is estopped to claim a priority as to said one-half over the lien of the deed of trust. Prior to the execution of the deed of trust, T. B. Boyd and his sister, Bessie L. Boyd, who had originally purchased the land as tenants in common, made a division thereof by the execution of deeds whereby T. B. Boyd acquired solely the title to the one-half which is described in the deed of trust. It appears that Mr. Boyd built a house on the half of the lot so conveyed to him, and as to which this controversy is waged; that the other half which was taken by Miss Boyd has no improvements, excepting an orchard. This property is situated in the rear of and adjoining some lots fronting on a highway and extending back about 170 feet to the land in question. Mr. Boyd owns one of these lots fronting on the highway and his sister owns the other; and the one-half of the tract in the rear which belongs to Mr. Boyd immediately adjoins his lot in the rear, and the one-half belonging to Miss Boyd adjoins immediately in the rear of her lot which fronts on the highway.

The evidence show that Mr. Boyd's half of the lot in the rear is now worth about $1,000 by reason of the improvements which he placed upon it, but this was done after the release is claimed to have been agreed upon by Mr. Barnes—so that this valuation is not material as bearing upon the probability that Barnes, as a prudent man, did not agree to make the release of the lien as to that portion of the lot. The evidence shows that the other half, owned by Miss Boyd,

was worth only about $200 when the agreement is alleged to have been made, and that he knew it.

The date of the deeds between Mr. and Miss Boyd is not definitely shown, as they are not in the record; but it is fairly to be inferred from testimony that it was in the latter part of October, 1927. These deeds were drawn by Mr. W. M. Fuqua, who was also attorney for the Donelson Bank & Trust Company. About the same time Mr. Boyd applied for a loan of $750 on his one-half of the lot. The bank would not make the loan unless the lien of the two $100 notes were released by Mr. Barnes. An instrument of such release was drawn by Mr. Fuqua and given by him to Mr. Barnes, who took it with him and said that he would have it executed, and it was to be recorded. Mr. Barnes and Mr. Boyd were both present. It was thought to be necessary for Mrs. Barnes to join in the execution of the release, and this is the reason given why Mr. Barnes did not execute it in Mr. Fuqua's office.

The release was never executed. It was found among the papers of Mr. Barnes after his death in December, 1928. Mrs. Barnes never knew of the bank having a deed of trust to the property until after the original bill in this cause was filed. She knew nothing of an agreement by her husband to make the release. She first saw or heard of the draft of the release after her husband's death. A copy of this draft is in the record, and, if it had been executed and delivered, it would have operated fully as a release of the lien of the two notes. Mrs. Barnes was asked and answered:

"Q. During your husband's lifetime there had been some discussion as you understand it, about his releasing a part of this property to some one else. Is that true? A. He just said something about me signing some papers in regard to this property, but he did not say what it was.

"Q. If your husband finally agreed to releasing his lien on this property, did you know about it? A. No, sir, I did not."

The bank made the loan of $750 to Mr. Boyd, the deed of trust was registered on December 1, 1927. It contains a covenant that the land was unencumbered.

Mr. Boyd testified (and there is no direct evidence to the contrary) that when he borrowed the $750 he advised the bank that he and his sister owed the two $100 notes; that the bank was unwilling to make the loan with these notes as a lien upon the property and it required him to arrange to have the lien released as a condition precedent to making the loan; that he told Mr. Barnes of his desire to borrow the money and of the bank's requirement of a release before it would make the loan; that Mr. Barnes said that $550 had been paid on the purchase price and "that would be all right." He testified that he told the bank that Mr. Barnes would make the release. He testified that the release was drafted by Mr.

Fuqua and given to Mr. Barnes for execution; that on the afternoon of that day he, the witness, left for Texas; that he was gone ten or twelve days; that when he returned the matter, as far as he knew, had been arranged, the money had been placed to his credit at the bank, and he never gave it any further thought, thinking that Mr. Barnes had delivered the release to Mr. Fuqua or to the bank.

Mr. Fuqua never knew until this bill was filed that the release never had been executed. Before the release was drafted, Mr. Boyd assured the bank that a release would be made by Mr. Barnes. His instructions from the bank were, and it was the understanding, that the loan would not be made without a release of the lien of the two notes. Mr. Fuqua testified that Mr. Barnes agreed in his presence to make the release. There is really no material conflict in the evidence. There was no exception to the testimony of Mr. Boyd as to an agreement made or transaction had with Mr. Barnes. Mr. Boyd admitted that Miss Boyd's half of the original lot was hemmed in by private property and had no way of approach to it except through her lot in front or through Mr. Boyd's lot. He testified that he and Mr. Barnes were close neighbors and friends; that Mr. Barnes, having a pasture but no water therein, used water from his lot; that Mr. Barnes agreed to make the release out of friendship and because $550 had already been paid. He admitted that he owed both debts but was unable to pay them.

We cannot escape the conclusion that Mr. Barnes did agree with Messrs. Boyd and Fuqua to make the release, but either from neglect or change of mind, failed to do so; that upon faith of his promise Mr. Boyd assured the bank that the agreement had been made and the release would be executed; that upon faith of this assurance the bank made a loan of $750 to Mr. Boyd upon what it believed was, or would be, a first mortgage upon the property, which it required as a condition of making the loan. Mr. Barnes knew that his release was necessary to enable Mr. Boyd to obtain the loan. He had agreed to make the release and he enabled Mr. Boyd to make the assurance to the bank and the bank parted with the money upon faith of it.

 The doctrine of estoppel by representation is ordinarily applicable only to representations as to facts, either past or present; and it is only where a representation as to the future operates as an abandonment of an existing right that an exception to this rule exists. 21 C. J., 1142; Union Mut. Life Insurance Co. v. Mowry, 96 U. S., 544, 24 L. Ed., 674; Bigelow on Estoppel (6 Ed.), 637; Johnson v. Insurance Co., 119 Tenn., 598, 107 S. W., 688. Instances of such exception are representations of intention not to claim interest in property, upon faith of which conveyances are made and money expended (Dickerson v. Colgrove, 100 U. S., 578, 25 L. Ed., 618; Prescott v. Edwards, 117 Cal., 298, 49 P., 178, 59 Am. St. Rep., 186; Elliot v. Whitmore, 23 Utah, 342, 65 P., 70, 90 Am. St. Rep., 700;

Richards v. Shepherd, 159 Ala., 663, 49 So., 251), or inferences of intention not to claim from standing by and permitting sale (Tennessee Coal, Iron & R. Co. v. McDowell, 100 Tenn., 565, 47 S. W., 153). But no estoppel will arise from a promissory representation as to future action dependent upon a future contract or instrument to be executed. Union Mut. Life Insurance Co. v. Mowry, supra; Johnson v. Insurance Co., supra. The distinction is made between estoppel in pais and contract, as stated in Bigelow on Estoppel (6th Ed.), 636:

"The representation or concealment must, in the second place, like a recital, in all ordinary cases have reference to a present or past state of things; for if a party make a representation concerning something in the future, it must generally be either a mere statement of intention or opinion, uncertain to the knowledge of both parties, or it will come to a contract, with the peculiar consequences of a contract, or to a waiver of some term of a contract, or of the performance of some other kind of duty." Citing many cases, among them Brightman v. Hicks, 108 Mass., 246, in which it was held that a promise within the statute of frauds could not be made binding by way of estoppel though it had been acted upon.

In 2 Pomeroy on Equity Jurisprudence (4th Ed.), section 808, as to estoppel, it is said:

"The facts represented or concealed must, in general, be either existing or past, or at least represented to be so. A statement concerning future facts would either be a mere expression of opinion, or would constitute a contract and be governed by rules applicable to contracts." Citing cases.

Therefore, an estoppel will not arise simply from a breach of promise as to future conduct, a mere executory agreement, or from a mere disappointment of expectations. See, also, Weaver v. Bell, 87 Ala., 387, 6 So., 298; Morris v. Orient Insurance Co., 106 Ga., 475, 33 S. E., 430; Allen v. Rundle, 50 Conn., 9, 47 Am. Rep., 599; Edwards v. Dickson, 66 Tex., 618, 2 S. W., 718, 721; Clark v. Havard, 122 Ga., 274, 50 S. E., 108.

. The only case quite analogous to the instant case upon its facts is Barron v. Ward, 144 Ga., 472, 87 S. E., 396, in which it appeared that A executed to B a security deed conveying a number of lots of land as security for a loan, which was duly recorded. Subsequently, A sold one of the lots to W who did not have actual notice of the security deed. A reported sale to B, stating that B could either take the purchase price and credit the note, or let the note continue for the original amount. B replied that he would release the lot and did not care for any part payment, but would allow the note to continue in force for the full amount. On the strength of this statement A told W the lot was free from all incumbrances and liens, and believing and relying on the statement by A, W paid A the agreed

purchase price for the lot. Under these circumstances it was held that B would be estopped, as against W, from asserting against the lot a lien based on the security deed.

The conclusion stated in that case is opposed to the great weight of authority in which the principles hereinbefore stated were applied. It is an extension of the rule of equitable estoppel which has not been made in this state or in other states, so far as we have been able to ascertain. In that case, as reported, no opinion accompanies the syllabus, so that the reasoning of the court is not given. We do not feel warranted in following that case as authority.

The Donelson Bank & Trust Company merely relied upon the expression of an intention to execute in writing an instrument in contemplation which was necessary to effect a release of the lien. It offered no evidence to show why it did not follow up the matter and see that the intention was fulfilled. The case is governed by the rule that no estoppel will arise from a statement relating to rights depending upon a contract yet to be made. The party here complaining had it in its power to guard in advance against any consequences of a subsequent change of intention and conduct by the person who had merely promised to execute the release. We must conclude that the chancellor reached the correct conclusion. His decree is affirmed. The costs of the appeal will be adjudged against the appellant and the surety on its appeal bond. The cause will be remanded for further proceedings in conformity with this opinion.

Faw, P. J., concurs.

CROWNOVER, J. In this case I am compelled to dissent. Barnes agreed to release his lien and to hold only the other lot as security, and the bank acted upon that representation, therefore Barnes' estate is estopped to later set up his lien. 6 Thompson on Real Property, section 4866; 39 Cyc., 1833; 3 Pomeroy's Equity Jurisprudence, section 1259; 29 Amer. & Eng. Ency. of Law (2 Ed.), p. 788; Thompson v. Dawson, 3 Head, 384.