**CITY OF CHATTANOOGA, TENNESSEE; and Felix Miller, Jr.; Donald W. Hayden, E. R. Pickett; and Fred Rothberger, Jr.**

v.

**The LOUISVILLE AND NASHVILLE RAILROAD COMPANY.**

Civ. A. No. 5089.

United States District Court
E. D. Tennessee, S. D.

Jan. 4, 1969.

Eugene Collins and W. A. Wilkerson, Chattanooga, Tenn., for City of Chattanooga.

Tanner & Jahn, Chattanooga, Tenn., for intervening plaintiffs.

Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for Louisville & Nashville Railroad Co.

## OPINION

FRANK W. WILSON, District Judge.

In this lawsuit the pursuit of the "General" continues. While the capture of the now ancient and historic steam locomotive known as the "General" remains the object of the pursuers in this lawsuit, unlike on that fateful day of April 12, 1862, life and death does not hang in the balance. Rather here the pursuers and the pursued vie with each other as to the more appropriate manner to preserve and do honor to the memory of the men and the traditions which are bound up in the story of the "General".

In an age when scarely a tradition heretofore honored by men is not under attack and when there seems to be scarcely any institution whose legitimacy is not suddenly subject to peremptory challenge, it is well that there should be those whose concern is to preserve the traditions that have stood the test of time and to defend the institutions that have made this a united nation of free men.

This lawsuit began with the issuance in a state court of an original attachment for the Civil War steam locomotive known as the "General". At the time the attachment was issued on September 11, 1967, the locomotive was being transported through Chattanooga, Tennessee, by the defendant, The Louisville and Nashville Railroad Company, and was destined to be delivered to the Town of Kennesaw, Georgia, in accordance with an understanding between the Louisville and Nashville Railroad Company and the State of Georgia. A preliminary injunction was likewise issued restraining the defendant from removing the "General" from the jurisdiction of the Court pend-

ing the action of the Court. Shortly thereafter the individual plaintiffs to this lawsuit were permitted by the state court to intervene as interested citizens in support of the original complaint of the City of Chattanooga. In due time the lawsuit was removed to this Court.

The single issue presented in this lawsuit is whether the City of Chattanooga and the public for which it acts have acquired an interest in the "General" recognizable either in law or in equity such as would entitle it to an appropriate judgment requiring that the "General" be maintained as a historical monument in Chattanooga, Tennessee, in perpetuity.

The case has now been submitted unto the Court upon cross motions for summary judgment. The record upon which these motions must be decided consists of the admissions and uncontested allegations in the pleadings, various affidavits, the plaintiffs' joint answers to interrogatories, and a series of 14 documents, the authenticity of which has been stipulated, although their relevance is objected to. Upon oral argument of the cross motions for summary judgment, each party conceded that there was no genuine or material issue of fact in the case. The case must accordingly be decided upon the present record.

It is the contention of the plaintiffs in this case that the City of Chattanooga and the public which it represents have a paramount right to retain or recover possession of the locomotive, the "General", from the defendant, The Louisville and Nashville Railroad Company, upon one or more of the following legal theories: (1) that the defendant has heretofore made a permanent dedication of the "General" to the citizens of Chattanooga, such dedication being made in the nature of a charitable trust; (2) that the City of Chattanooga and its citizens have acquired a prescriptive interest in the "General" entitling them to retain the engine as a permanent historical monument; (3) that the defendant has impliedly contracted that the "General" will remain upon permanent public dis-

play in the City of Chattanooga; and (4) that under the law of estoppel the defendant should be denied the right to remove the "General" from public display in the City of Chattanooga. Before considering any of these legal contentions, a statement of the undisputed facts in the record should be made. Preliminary thereto it should be noted that the jurisdictional facts are not in dispute. Both diversity of citizenship and jurisdictional amount are conceded.

*The Western and Atlantic Railroad and the Origin of the General*

On December 21, 1836, the State of Georgia created by legislative enactment the "Western and Atlantic Railroad of the State of Georgia." The Western and Atlantic Railroad was to be wholly owned by the State of Georgia. In accordance with this authority the right-of-way was acquired and a railroad was constructed between Atlanta, Georgia, and Chattanooga, Tennessee. The portion of the right-of-way which extends from the Georgia-Tennessee state line to the Union Railway Terminal within the City of Chattanooga lies within the State of Tennessee and within the City of Chattanooga. Title to this land was duly acquired by the State of Georgia and its ownership remains in the State of Georgia to this day, as does the title to all of the properties belonging to the Western and Atlantic Railway, although as hereinafter noted the lease did provide a method for the lessee acquiring title to rolling stock. From its inception until 1870 the Western and Atlantic Railway was operated by the State of Georgia. Since 1870 the Western and Atlantic Railway has been under lease, the defendant being the present lessee.

The steam locomotive which is the subject of this lawsuit was built for the Western and Atlantic Railway in 1855 at Paterson, New Jersey, by the Rogers Locomotive Works. Upon its acquisition the Western and Atlantic Railway gave the locomotive the name "General" and placed it in service running principally between Atlanta and Chattanooga.

Though the "General", with its wood burning boiler, its funnel smoke stack and its two-wheel drive, is now so small and quaint even for a steam locomotive, at the time the Civil War commenced in 1861 it was a rather modern and most serviceable locomotive. However, it was not then otherwise noteworthy. Had it not been for the events of a fateful day in April of 1862, and the role it played on that date, the "General" would doubtless long since have disappeared, the victim of time and railroad progress. To understand the immortality of the "General" as well as to understand why it now finds itself the center of an interstate legal struggle, one must know the Civil War story of Andrews' Raid.

### Andrews' Raid and The General

The story of Andrews' Raid, or "The Great Locomotive Chase," the name by which it is sometimes known, is one of the more dramatic—and tragic—stories to come out of a dramatic and tragic era in the history of this nation, the American Civil War. Although the record in this case does not reflect much of the story which entitles the "General" now to be considered as a historic relic of importance, the Court can take judicial notice of that story. The following is an abbreviated account of that story.

By April of 1862 the war had already lasted longer than anyone had originally thought likely or even possible. However, in February of that year Union forces, under the leadership of Grant, had achieved significant victories at Forts Henry and Donaldson, breaking the Confederate line in Kentucky and opening up Middle Tennessee to Union troops. By April of 1862 the Confederate forces were concentrated at Corinth, Mississippi, and both Grant and Buell were advancing with Union Armies toward that point. General O. M. Mitchell had been left with one Union division to occupy Nashville and to advance the Union position in that area of Tennessee. General Mitchell determined to press on toward Chattanooga, occupying as many strategic points in that direction as he could before their defenses could be prepared.

By April 7, 1862, Mitchell had advanced with a detachment of his troops to Shelbyville, Tennessee. His plans were to seize Huntsville, Alabama, and then move rapidly by rail to capture Chattanooga. To further his plans General Mitchell determined to send a raiding party deep into enemy territory. Twenty-four soldiers, all volunteers from three Ohio regiments, were selected for the hazardous venture. They were placed under the leadership of James J. Andrews, a civilian, who had previously rendered services to the Union behind the Confederate lines in the Chattanooga and Atlanta areas. Their instructions were to secretly enter the enemy territory and by means of capturing a train to burn the bridges on the northern part of the railroad between Atlanta and Chattanooga, thus isolating Chattanooga from assistance from the South and East. Chattanooga at that time was ungarrisoned by Confederate troops. Andrews' party was to confirm the success of their raid by rejoining General Mitchell's forces west of Chattanooga as those forces moved upon Chattanooga along the railroad line from Huntsville. The raid and the rejoining with Mitchell's forces were to occur upon Friday, April 11, 1862.

Upon the appointed date, General Mitchell's forces seized Huntsville and a detachment of 2,000 men, under the personal command of Mitchell, swiftly advanced by rail to within 30 miles of Chattanooga. Then, receiving no word from Andrews' party as planned, Mitchell turned back at this point. Another year and a half was to pass and three major battles with heavy losses were to be fought at Murfreesboro, Chickamauga and Chattanooga before that City was to be secured by the Union. Why had Andrews' raiders failed to keep their rendezvous with General Mitchell? The story is the story of the "Great Locomotive Chase".

Departing from Shelbyville in civilian dress upon the evening of April 7, 1862,

Andrews' party broke into small detachments to work their way to Marietta, Georgia, where they were all to meet at an appointed hour and place on the evening of April 10. The raid was then to be conducted on April 11 in coordination with the movement of General Mitchell's forces upon Chattanooga. However, heavy rains and swollen streams delayed Andrews' progress and, thinking Mitchell's forces would surely be likewise delayed, Andrews took it upon himself to delay by one day the execution of the raiders' plans. The raid and the rejoining with Mitchell's forces were now rescheduled by Andrews to occur upon Saturday, April 12, rather than upon the originally agreed date of Friday, April 11. Friday was clear and trains ran upon schedule upon the Atlanta-Chattanooga line. Upon Saturday it rained throughout the day and nothing ran on schedule. These factors, along with others, sealed the doom of Andrews and his party's venture.

On the morning of April 12, 1862, 20 men, including Andrews, boarded the northbound train at Marietta, Georgia, having purchased tickets for various destinations to avoid suspicion five men failed to keep their rendezvous with Andrews in Marietta, although two of them were later captured and imprisoned with the rest. The locomotive pulling that train was the "General". Eight miles north of Marietta the train made a scheduled stop at Big Shanty—since renamed the Town of Kennesaw. When the crew and passengers departed from the train for breakfast, as was the custom, Andrews and his party quickly uncoupled the engine and three boxcars from the rest of the train, seized the engine and headed north under full steam. The train's conductor, W. A. Fuller, witnessed the unscheduled departure of the train from his breakfast table. He and two other members of the train crew gave chase on foot.

For a time all went well with Andrews and his raiders. They made rapid progress, stopping from time to time to tear up track to avoid being overtaken and to cut telegraph wires to avoid any warning being sent ahead. To divert suspicion and obtain the right-of-way, Andrews boldly represented to station crews and other traffic that he met upon the rail that his train was specially commissioned and ordered to carry powder to General Beauregard at Corinth, Mississippi. At Kingston, Georgia, Andrews and his party were delayed more than an hour by unscheduled trains coming from the North. When he demanded to get through with his load of powder for General Beauregard, he was advised that Mitchell had captured Huntsville and was advancing on Chattanooga so that all trains were being moved out of Chattanooga to prevent their capture. Other unexpected delays were encountered along the line.

Meanwhile, Fuller and his party were continuing their relentless pursuit, first on foot for a distance of several miles, then by handcar, then with another locomotive, picking up reinforcements along the way.

As Andrews' party arrived in the vicinity of the bridges that were to be destroyed, north of Dalton, Georgia, the pursuit was so close as to prevent their accomplishing their purpose. Two of the boxcars had previously been dismantled for fuel or dropped piecemeal as obstructions upon the track. The last boxcar was fired and left upon a bridge to burn, but before the bridge structure was itself extensively fired, Fuller's party drove into the fired car and pushed it from the bridge.

With throttles wide open, the race continued for mile after mile. The locomotive chase had now become a race for life for Andrews and his raiders. Finally, the General began running low on steam. With no wood for fuel and no time to stop for refueling, Andrews' party found their situation growing more desperate by the moment. Screaming up the track almost within gun shot behind them in the locomotive "Texas" was Conductor Fuller, with a detachment of Confederate troops he had picked up along the way. (The

"Texas" is now enshrined as a historical monument in Grant Park, Atlanta, Georgia.) At a point some 18 miles short of Chattanooga, the General's last pound of steam was used. As the General coasted to a stop, Andrews ordered his men to jump and disperse themselves in the woods, each man endeavoring to save himself.

Within a week Andrews and all members of his party had been captured, including two who had failed to catch the morning train at Marietta. The captives were swiftly tried by military court. Andrews and seven of his cohorts were sentenced to death. On June 12, 1862, Andrews' sentence was carried out. A few days later the other seven men upon whom a death sentence had been pronounced were likewise executed. The bodies of all eight now lie in the National Cemetery at Chattanooga. In 1890, a monument was erected at their grave site by the State of Ohio. Mounted on top of the monument is a replica of the "General".

The sequel to the story of Andrews' Raiders, while less tragic, remains dramatic. The remaining raiders shortly made a bold escape from the Confederate prison at Atlanta. Eight succeeded in eventually making their way back to the North. Six were recaptured, but in March of 1863 they, too, were repatriated in a prisoner exchange between the Union and the Confederacy. Meanwhile, on July 12, 1862, the United States Congress by resolution created the Congressional Medal of Honor. The first 19 presentations of the nation's highest award for valor in time of war went to the 19 Union soldiers who participated with James Andrews in the "Great Locomotive Chase".

Returning to the story of the "General", following its recapture it was returned to the service of the Confederacy on the Western and Atlantic line. Following the Battle of Atlanta, the "General" was once again captured by the Union forces on September 1, 1864, this time in a damaged condition as a result of the explosion of an ammunition train it was pulling. It was repaired by the Union forces and put in operation by the United States Military Railroad until September 25, 1865, when by order of the commanding Union general, it, along with other rolling stock and properties of the Western and Atlantic Railway were returned to the State of Georgia.

### The Leasing of The Western and Atlantic Railway and The General

Following the Civil War the State of Georgia continued to operate the Western and Atlantic Railway until 1870. Then pursuant to an act authorizing the leasing of the line, the Western and Atlantic Railway was leased to private individuals for a period of 20 years, commencing on December 27, 1870. The "General" was among the rolling stock covered by the lease. At the expiration of the initial lease, a second lease was executed by the State of Georgia, this time the Western and Atlantic Railway being leased to the Nashville, Chattanooga & St. Louis Railway, a Tennessee corporation, the lease commencing upon December 27, 1890. Once again the "General" was among the rolling stock that was leased. A third lease of the Western and Atlantic Railway was made by the State of Georgia, effective as of December 27, 1919. This time the lease was for a period of 50 years, to expire on December 27, 1969. The Nashville, Chattanooga & St. Louis Railway was again the lessee and the "General" was again among the rolling stock that was leased.

Under the 1890 lease some lack of clarity existed with respect to the obligation of the lessee to return or account for rolling stock at the end of the lease, but this matter was clarified in the 1919 lease by a provision to the effect that the lessee would account for all rolling stock received under the 1890 lease by payment of an agreed value of $361,041.-00 or by substitution of replacement stock of an equal value, such accounting to be made at the expiration of the current lease in 1969. This right of the lessee to acquire title to the rolling stock

and account for the value thereof was made retroactive to 1890, the date of the initial lease to the Nashville, Chattanooga & St. Louis Railway. In 1957 the Nashville, Chattanooga & St. Louis Railway merged into the defendant, The Louisville and Nashville Railroad Company, and the defendant herein became the lessee of the Western and Atlantic Railway under the provisions of the aforesaid lease. Thus no issue exists with respect to the Nashville, Chattanooga & St. Louis Railway, and its successor, The Louisville and Nashville Railroad, having acquired title to the "General" effective as of the 1890 lease.

*The Status of The General Since 1890*

It is with respect to the use and handling of the "General" since 1891 by the Nashville, Chattanooga & St. Louis Railway, and its successor, The Louisville and Nashville Railroad, that the City of Chattanooga now predicates its claims in this lawsuit. These circumstances must accordingly be recounted.

The historical significance of the "General" was readily recognized by the Nashville, Chattanooga & St. Louis Railway upon its acquisition under the 1890 lease, with the result that in 1891 the famous Civil War engine was placed upon public display in Chattanooga, Tennessee. The "General" remained on public display in the Union Station in Chattanooga from 1891 until 1961 except for brief intervals. An appropriate plaque at the site recounted the story of the General's fame for the benefit of the viewing public. From time to time thereafter the Nashville, Chattanooga & St. Louis Railway, acting both in its own name and in the name Western and Atlantic Railway, published advertising and public service pamphlets and brochures in which it pictured the "General" and told the story of its Civil War fame. These pamphlets and brochures, commencing no later than 1909 and from time to time thereafter up until at least 1933, advised the public that the "General" was on display at the Union Station in Chattanooga. "It is there" states the

1909 pamphlet "to remain permanently as a monument to American valor and to be seen at any time by travelers passing through Chattanooga over this Railway". Similar language announcing the Union Station at Chattanooga as the General's "permanent resting place" and that it there "stands as a monument to American valor" was repeated from time to time over the years in publications issued by the Nashville, Chattanooga & St. Louis Railway. In 1933 the "General" was temporarily taken to Chicago by the Nashville, Chattanooga & St. Louis Railway, where it was put on display at the Chicago World's Fair of that year. The public viewing this display were advised that "the permanent resting place of this famed relic of the Civil War is in the Union Station at Chattanooga, where it stands as a memorial to American valor and has been seen by travelers passing through Chattanooga over the Nashville, Chattanooga & St. Louis Railway."

Recognition of the "General" as being a historical monument worthy of public attention, remembrance and acclaim was early given by the City of Chattanooga. The City adopted a likeness of the "General" upon its official seal and it so continues unto this day. The "General" was included in tourist publications as a major tourist attraction in the City.

When upon two previous occasions, once in 1939 and again in 1959, efforts were made by the State of Georgia to recover the "General", the attempts were met by spirited opposition on the part of the City of Chattanooga and its citizens. Upon each of these occasions many statements were made by public and private individuals in opposition to the move. It further appears that neither the Nashville, Chattanooga & St. Louis Railway in 1939 nor The Louisville and Nashville Railroad in 1959 would accede to any request on the part of the State of Georgia to move the "General" from its place of display in the Union Station at Chattanooga. However, in 1961 The Louisville and Nashville Railroad did remove the "General" from Chattanooga. Upon inquiry by officials of the City of

Chattanooga, the defendant is reported to have advised on this occasion that the locomotive was being removed for repairs at the defendant's railroad shops in Louisville, Kentucky, and thereafter it would be displayed at various points about the nation in connection with the Civil War Centennial activities, but that when such centennial use was over the locomotive would be returned to Chattanooga. Except for a centennial observance of Andrews' Raid held in Chattanooga upon April 14, 1962, however, the "General" was not again returned to Chattanooga for display. Rather, in 1967, in response to further efforts by the Georgia State Legislature to recover the "General," it was announced by The Louisville and Nashville Railroad that the Civil War engine, now fully restored to operating condition, would be delivered by that Railroad to the State of Georgia for permanent placement and display at Kennesaw, Georgia, the place of its capture by Andrews' Raiders in 1862. Delivery of the engine to Kennesaw was to be made by the defendant on or before September 14, 1967, for ceremonies scheduled on that date. The "General" was attached by the City of Chattanooga in the present lawsuit upon September 12, 1967, as it arrived in the City en route to Georgia.

Before turning to a consideration of the legal issues raised by the present motions, one further factual matter should be noted. It appears undisputed that between 1891 and 1961, when the "General" was on display in Chattanooga, the engine was at all times located in the Union Station, property that was privately owned by the Nashville, Chattanooga & St. Louis Railway and its successor, The Louisville and Nashville Railroad. Although some claim was made in early pleadings in the case that the City of Chattanooga or its citizens had contributed in some manner to the upkeep and maintenance of the "General", it is now conceded by the plaintiffs that they have no knowledge of any such support or contribution to the maintenance or display of the "General". It rather appears undisputed that the "General" has at all times since its acquisition under the 1890 lease been under the exclusive custody and control of the defendant, or its predecessor in interest, and that since its acquisition all costs incident to the maintenance, repair and display of the engine have been borne by the defendant or its predecessor in interest.

### The Law and The General

■ Before turning to a consideration of issues of substantive law, it should be noted that the jurisdiction of this Court in the present lawsuit is based upon diversity of citizenship as between the parties. Accordingly, this Court must look to the law of Tennessee in resolving all issues of substantive law, the same as would have occurred in the state court had the case not been removed to this court. Erie Railroad Co. v. Thompkins (1938), 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188.

As noted in the introductory portion of this opinion, the plaintiffs advance four legal theories or contentions as a basis for sustaining their attachment and for securing the retention of the "General" in the City of Chattanooga as a historical monument. Briefly these theories and contentions are (1) that a gift or dedication of the "General" in the nature of a charitable trust had been made by the defendant to the City or to the citizens of Chattanooga; (2) that the City and its citizens have acquired a prescriptive right in the "General"; (3) that the defendant had by its conduct impliedly contracted with the City and its citizens that the "General" would remain in Chattanooga permanently as a historical monument; and (4) that the defendant would be estopped from removing the "General".

■■ The latter three contentions of the plaintiffs, that is the existence of rights in the "General" by reason of prescription, implied contract, or estoppel, may be considered without the necessity of extended discussion. The plaintiffs omitted any reference to these

theories in their brief and argument. It is not clear from the complaint just how the term "prescriptive right" is used by the plaintiffs. If it is used in its accurate sense, there of course could be no prescriptive right in the plaintiffs, for when correctly used the word "prescription" refers to the acquisition of an easement or other incorporeal hereditament in real property and is not a term accurately used with reference to interest in personal property. See 25 Am. Jur.2d, "Easements and Licenses" § 39 et seq; 3 Am.Jur.2d, "Adverse Possession" § 4. To the extent that the claim of prescriptive rights may have been intended by the plaintiffs as an assertion of rights acquired by adverse possession, it is clear that there has never been any possession of the "General" by the plaintiffs, much less an open public notorious or "adverse" possession. See 3 Am.Jur. 2d, "Adverse Possession" § 202. To the extent that the claim of prescriptive rights may have been intended by the plaintiffs as asserting rights acquired by donation, either outright or in the nature of a trust, these claims will be hereinafter fully considered. Much that has been said with reference to the plaintiffs' use of the term "prescription" in their complaint would be equally applicable to the use of the term "dedication" in their complaint. Dedication refers to the intentional appropriation or donation of land and is not accurately used to describe the gift or donation of personal property, whether in trust or otherwise. See 23 Am.Jur.2d, "Dedication" § 1. To the extent that the term "dedication" is used by the plaintiffs to mean a donation, either outright or in trust, these claims will be hereinafter fully considered.

 Considering next the plaintiffs' assertion in their complaint of the acquisition of rights in the "General" by reason of an implied contract, there is no evidence in this record of any contractual rights in the plaintiffs having been acquired by the plaintiffs. In their response to interrogatories the plaintiffs themselves state, "There is no

written contract of which the plaintiffs are aware between the defendant and the City of Chattanooga or anyone on its behalf relative to the engine 'General'." (Response to Interrogatory No. 5) There is likewise an absence of evidence of an oral contract. While contracts may be implied from a course of conduct, there is no evidence of any mutuality of promises sufficient to support a contract even by implication. Concededly neither the City of Chattanooga nor its citizens have ever assumed any obligation toward the maintenance or display of the "General", nor have they made any promise to or assumed any obligation toward the defendant. The element of mutuality essential to a contract, whether express or implied, is wholly absent in the record.

 If by implied contract the plaintiffs seek to assert the existence of a quasi contract, or a contract implied in law, this theory, too, is wholly without factual support in the record. Quasi contracts, or contracts implied in law, arise only where one party has been unjustly enriched at the expense of another. Under such circumstances the law implies a promise to make restitution to the extent of the unjust enrichment. There is a total absence of evidence in the record in this case of any element of unjust enrichment on the part of the defendant in its acquisition or possession of the "General".

 Finally, and with regard to the third contention made in the pleadings, but upon which the plaintiffs advanced no argument in support thereof, that is the claim of acquisition of rights in the "General" by way of estoppel, it is clear that estoppel can never be asserted to create a right nor to give a cause of action, but rather it serves only to prevent losses otherwise inescapable and to preserve rights already acquired. Henry County v. Standard Oil Co. (1934), 167 Tenn. 485, 71 S.W.2d 683, 93 A.L.R. 1483; see also 28 Am.Jur.2d, "Estoppel and Waiver" § 33. As is often stated in this regard, estoppel operates always as a shield and never as a sword. Addi-

tionally, there is an absence of evidence in this case either of such conduct on the part of the defendant or of such reliance on the part of the plaintiffs as would give rise to an equitable estoppel. This is particularly true under the law of Tennessee where the doctrine of promissory estoppel has been rejected. Barnes v. Boyd (1934), 18 Tenn.App. 55, 72 S.W.2d 573.

The full thrust of the plaintiffs' argument is directed toward their contention that the defendant's actions and representations in regard to the "General" have been such as to create a charitable trust in favor of the City and its citizens with regard to the "General". The evidence in support of this contention, when looked to in a light most favorable to the plaintiffs, may be summarized as follows. The Nashville, Chattanooga & St. Louis Railway first acquired possession of the "General" from the State of Georgia under its lease of the Western and Atlantic Railway in 1890. By subsequent amendments to that lease the Nashville, Chattanooga & St. Louis Railway acquired the right to obtain full title to the "General" by payment of an agreed and rather nominal amount at the termination of the current lease in 1969. Shortly after acquiring possession of the "General" the locomotive was put on display by the Nashville, Chattanooga & St. Louis Railway in its Union Station at Chattanooga, Tennessee. The engine remained on such display, with the exception of short intervals, from 1891 until 1961, its status as a Civil War relic and its role in the history of that War being appropriately announced. The events giving rise to the fame of the "General" were centered about Chattanooga and the City was therefore an appropriate place for the display of the engine. Moreover, the City of Chattanooga demonstrated its interest and recognition of the presence of the "General" as a historical monument in its midst by adopting a likeness of the "General" upon its official seal. The citizens of Chattanooga likewise participated in the recognition of the "General" as a historical monument welcomed within Chattanooga and advertised the engine as a significant tourist attraction in the City. From time to time the Nashville, Chattanooga & St. Louis Railway, acting both in its own name and in the name of the Western and Atlantic Railway, issued pamphlets and brochures advertising the presence of the "General" on display in its Union Station in Chattanooga, Tennessee, the following being language typical to these publications:

> "The engine 'General' made famous by the Andrews Raiders, has been sent to Chattanooga, Tennessee, by the Nashville, Chattanooga & St. Louis Railway and given a prominent place in the Union Depot. It is there to remain permanently as a monument to American valor and can be seen at any time by travelers passing through Chattanooga over this Railway."

While on display in Chattanooga, the "General" was at all times in the sole custody and control of the Nashville, Chattanooga & St. Louis Railway and its successor, The Louisville and Nashville Railroad, and was located upon property privately owned by the said railroads. They bore the entire cost of the maintenance and display of the "General" and neither the City of Chattanooga nor its citizens appear to have contributed any financial or other material support to the maintenance or display of the engine. The "General" was removed from Chattanooga in 1961 by the defendant, The Louisville and Nashville Railroad, with the representation that it would be returned to Chattanooga after repairs and after the engine had been used elsewhere in Civil War Centennial activities. However, the engine was not so returned to Chattanooga, and in 1967 The Louisville and Nashville Railroad made a commitment to the State of Georgia to deliver the "General" to that State for permanent display at Kennesaw, Georgia.

There appears to be no question but that valid trusts for charitable uses may

be created in Tennessee. White v. Hale (1865), 42 Tenn. 77; Gibson v. Frye Institute (1917), 137 Tenn. 452, 193 S.W. 1059, L.R.A.1917D, 1062; Milligan v. Greeneville College (1928), 156 Tenn. 495, 2 S.W.2d 90; Davis v. Bullington (1932), 164 Tenn. 272, 47 S.W.2d 555. Likewise it would appear that no question exists but that a valid charitable trust could be created with respect to a locomotive having historic value such as the "General". The establishment and preservation of historical monuments possess such educational qualities and contribute to accomplish such socially beneficial purposes as to qualify as the subject of a charitable trust. See annotation: "Validity, As For a Charitable Purpose, of Trust For Dissemination or Preservation of Material of Historical or Other Educational Interest or Value" 12 A.L.R.2d 849; Bogart Law of Trusts, p. 142 et seq.; see also 15 Am. Jur.2d, "Charities" § 81.

 The issue presented for decision here is accordingly whether, under the evidence as recounted above, a valid and irrevocable charitable trust was in fact created in favor of the City of Chattanooga and its citizens with respect to the "General". The Court is of the opinion that the evidence would not support any such conclusion for two reasons. In the first place, although charitable trusts are favored by the courts and are therefore exempt from some of the rules applicable to private trusts, such as the rule against perpetuities, many of the requisites to a valid private trust are also requisites to a valid charitable trust. One such requisite is that there must be a reasonably certain expression of a donative trust intent before a charitable trust may be found. Ratto v. Nashville Trust Co. (1942), 178 Tenn. 457, 159 S.W.2d 88, 141 A.L.R. 341. The Court is of the opinion that the evidence here fails to establish an intent upon the part of the defendant or its predecessor in interest to establish a charitable trust with respect to the "General". Although the use of the words "trust" or "charitable

trust" are not essential to the creation of a charitable trust, some reasonable equivalent of such a donative intent and purpose must appear. Restatement of Trusts, Vol. 2, § 351. Never at any time from 1891 to the present has the defendant or its predecessor in interest ever done or said anything to indicate an intent to relinquish any custody, control, or possession of the "General" to or for the use of the City of Chattanooga or its citizens. The defendant has at all times exercised full and complete dominion and control over the "General," including displaying the engine at all times on its private property, always assuming full financial and custodial responsibility for the maintenance and display of the "General," moving the locomotive at such times and to such places as it elected so to do. Neither was the announcement that the display was a "permanent monument to American valor" indicative of such a donative intent as to authorize a court to construe the defendant's possession and custody as that of a trustee of a charitable trust. To hold that the prolonged display of a privately owned historic relic upon private property and at private expense, when accompanied by an announcement that it constitutes a permanent historical monument, is sufficient of itself to create a charitable trust with respect to such relic could well have the effect of withdrawing from public display privately owned objects of great historic, artistic or educational interest. Such forcing into the public domain of artistic, educational or historic items in the absence of a donative intent and merely because they are capable of being the object of a charitable trust might well have the opposite effect to that which it is the purpose of charitable trusts to encourage, that purpose being the social benefit that comes from the public display of such items.

 In the second place, even assuming that a valid charitable trust was created in favor of the City of Chattanooga and its citizens with respect to the "General," under the law of Tennessee that trust would have been subject

to relocation at any time. The plaintiffs rely upon the representations made by the defendant and its predecessors that the "General" would be "permanently" located in the Union Station at Chattanooga, Tennessee. Under Tennessee law it appears to be settled that a charitable trust may be relocated even though it was stated to have been "permanently" established at a particular location. In the case of Southwestern Presbyterian University v. City of Clarksville (1923), 149 Tenn. 256, 259 S.W. 550, this very issue was before the Court. In that case Southwestern Presbyterian University had for some 50 years been located at Clarksville, Tennessee. The University had been supported over the years in a substantial manner by monetary contributions from citizens of Clarksville and the City itself on one occasion donated $50,000.00 to the University. Under a prior court order it had been found that the University was "permanently" located at Clarksville. The directors of the University proposed to move the institution from Clarksville, Tennessee to Atlanta, Georgia. The City of Clarksville resisted the move asserting, as does the City of Chattanooga in this case, that a charitable trust existed requiring the location of the University at Clarksville in perpetuity. The Supreme Court of Tennessee held, however, that the University could be relocated and that the words describing the University as "permanently" located at Clarksville did not prevent the relocation. In this regard the Court stated:

"* * * In this connection it may be remarked that the use of the words 'permanently located' in the third paragraph is not inconsistent with this conclusion. 'Permanent' is not synonymous with 'perpetual.' It is used in contract with temporary—as a permanent residence, rather than a transient, or a permanent road, rather than a makeshift—but in ordinary acceptation it does not convey the idea of never changing. One adopts a permanent location, or occupation, meaning only that the adoption is made without present contemplation of change, but subject always to exigencies or inducements of circumstances which may arise. The words 'permanently located' used in a conveyance of land to an incorporated institution were construed by the Supreme Court of the United States in an early case not to mean perpetually. Mead v. Ballard, 7 Wall. 290, 19 L.Ed. 190." Id. at 266–267, 259 S.W. at 553.

Under the holding of the Tennessee Supreme Court in the *Southwestern Presbyterian University* case, it would appear clear that the defendant would have the right to relocate the "General," even though it were found to be the subject of a charitable trust.

In conclusion it should be noted that the issue before this Court is not the appropriateness or inappropriateness of the display of the "General" either in Chattanooga, Tennessee, or in Kennesaw, Georgia. Nor is it for this Court to decide where or how the "General" might most appropriately be displayed. The sole issue before this Court is whether the City of Chattanooga is or is not entitled to maintain the present attachment and injunction action. The Court has concluded that the attachment in this case must be released and the injunction dissolved and the case dismissed.

An order will enter in accordance with this opinion.