**RHODES ENGINEERING COMPANY, INC., Appellant,**

v.

**PUBLIC WATER SUPPLY DISTRICT NO. 1 OF HOLT COUNTY, Rick Bottoms, Wayne E. Kurtz, Maurice E. Atkins, John Dudeck, Max Kurtz, John T. Conway, James W. Farley and Bartlett & West Engineers, Inc., Respondents.**

**No. WD 61821.**

Missouri Court of Appeals,
Western District.

Jan. 27, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 2004.

Application for Transfer Denied
March 30, 2004.

David M. Duree, St. Louis, MO, for Appellant.

Charles R. Hay, David P. O'Neal, Harold S. Youngentob, Topeka, KS, Zel M. Fischer, Rock Port, MO, for Respondents Bartlett & West Engineers, Inc., and John T. Conway.

R.A. Brown, Jr., St. Joseph, MO, for Respondent James W. Farley.

R. Dan Boulware, Sharon Kennedy, St. Joseph, MO, for Respondents Public Water Supply District No. 1 of Holt County, Rick Bottoms, Wayne E. Kurtz, Maurice E. Atkins, John Dudeck, and Max Kurtz.

Before: ULRICH, P.J., and HOWARD and NEWTON, JJ.

VICTOR C. HOWARD, Judge.

Plaintiff, an engineering firm, sought to enforce a contract with the Holt County Public Water Supply District No. 1 (the "Water District"), under which Plaintiff was to provide engineering services for the construction of a water supply system in Holt County, Missouri. Plaintiff was compensated for the preliminary work it performed on the project under an interim contract. But, once the Water District was statutorily incorporated (two years after the contract was executed), it awarded the permanent contract to another engineering firm. Plaintiff then brought suit against various defendants for breach of contract, tortious interference with contract rights or business expectancy, and fraud. All Defendants filed motions for summary judgment, which the trial court granted.

Plaintiff brings six points on appeal challenging the various grounds upon which the court granted summary judgment. As explained below, we affirm the trial court's summary judgment on Plaintiff's claims: (1) that the Water District breached the permanent contract, because there was no valid contract upon which to base the breach of contract claim; (2) that certain Defendants tortiously interfered with a contract or business expectancy, because there was no permanent contract with which the Defendants could tortiously interfere, there was no interference with the interim contract, and there was no valid business expectancy arising from either the invalid permanent contract or the interim contract; and (3) that certain of the

Defendants committed fraud in representing to Plaintiff that the Water District would adopt, ratify, and execute the permanent contract once it became a legal entity, because Plaintiff cannot establish, as a matter of law, that it had a right to rely upon the allegedly fraudulent representations. However, genuine issues of material fact do exist as to whether the Interim Parties breached the interim contract in failing to pay Plaintiff for all work done thereunder, so we reverse and remand on that sole issue.

## Background

We begin with a background of the controversy now at hand. Additional facts are provided where necessary in our consideration of Plaintiff's points on appeal.

**I. THE CONTRACT:** In the mid-1990's, residents of Holt County proposed the creation of a water supply system for their rural area. A preliminary engineering study was necessary to obtain the federal funds to create a public water supply district. Thus, they contacted Donald Sayre, of Rhodes–Sayre and Associates, Inc., who had experience developing public water supply districts in Northwest Missouri.

On May 17, 1995, Donald Sayre, as president of Rhodes–Sayre & Associates, Inc.

(Plaintiff),[1] executed the subject contract denominated an "Agreement for Engineering Services" on Form FHA 442–19 (Rev.7–21–67).[2] The contract recited that it was an agreement between Plaintiff as "ENGINEER" and the Holt County Public Water Supply District as "OWNER"; it actually included two agreements or contracts:

The first is the **"Permanent Agreement,"** as the parties refer to it, set out on pages one through five of the contract and containing six sections. Sections A through E detail the services to be performed by Plaintiff and how OWNER is to compensate Plaintiff for those services.[3] Section F declares, "This agreement shall not become effective until approved by the FHA," and details how such approval shall occur. At the close of Sections A through F is the section for execution. Wayne Kurtz executed the Permanent Agreement under the signature provision for "OWNER,"[4] and Donald Sayre executed the agreement under the "ENGINEER" signature provision. The signature line for the FHA's approval is blank.

Second, following this signature page of the Permanent Agreement, at page six, is the **"Interim Agreement."** Just below its heading, this agreement parenthetically states it is, "(For use only when OWNER

1. Defendants note in their brief that they accepted as true for purposes of summary judgment Plaintiff's contention that "Rhodes Engineering" is the successor-in-interest to Rhodes & Sayre Associates, Inc. This is not an issue on appeal, and we will refer to Rhodes–Sayre & Associates, Inc., and Plaintiff interchangeably.

2. This form indicates it was "Developed in cooperation with and available from: Missouri Society of Professional Engineers," for use when part of what the Owner intends to construct "may be paid for in part with financial assistance from the [Farmers Home Administration (FHA)] of the United States De-

partment of Agriculture pursuant to [therein named federal statutes] and the ENGINEER agrees to perform the various professional engineering services required for the design and construction of said system."

3. A "Missouri Addendum to Agreement for Engineering Services" at page 7 amends sections A, B, D, and E to include specifics of services to be rendered by Plaintiff and compensation specifics.

4. The evidence indicates that Plaintiff later typed in the designation of "Chairman" in the space designated "Title" just below Wayne Kurtz's signature.

is not legally organized on the date the Agreement for Engineering Services [ (the Permanent Agreement) ] is executed)." On May 17, 1995, when the Permanent Agreement was executed, the Water District (OWNER) was not legally organized; that did not occur until 1997. Rather, at the time the agreements were executed, a steering committee had been formed for the purpose of developing the Water District. This Interim Agreement provided as follows:

> In lieu of the execution of the foregoing [Permanent Agreement] dated the [17th] day of May, 1995, by the party designated as OWNER therein, the ... INTERIM PARTIES have executed this Interim Agreement in consideration of the services described in Section A–1 thru 5, inclusive, of said [Permanent Agreement] to be performed by the ENGINEER [ (Plaintiff) ], and the ENGINEER agrees to accept this Interim Agreement as evidenced by ENGINEER'S execution hereof contemporaneously with the execution of the [Permanent Agreement]. The ENGINEER also agrees to perform services set forth in said Section A–1 thru 5, inclusive, of said agreement, [governing preliminary engineering services,] in consideration of the sum stated in Section B–1, [i.e., Plaintiff will receive $10 per meter sign-up "after the review of the preliminary engineering report by the FHA and acceptance by the OWNER."]

> It is anticipated that OWNER shall promptly become a legal entity with full authority to accept and execute said [Permanent Agreement] and that the OWNER, after becoming so qualified, shall promptly take such action as necessary to adopt, ratify, execute, and become bound by the [Permanent Agreement]. The ENGINEER agrees that upon such due execution of the [Permanent Agreement] by the OWNER, the INTERIM PARTIES automatically will be relieved of any responsibility or liability assumed by their execution of this Interim Agreement, and that the ENGINEER will hold the OWNER solely responsible for performance of the terms and conditions imposed upon the OWNER by the [Permanent Agreement], including the payment of all sums specified in Section B–1 of said Agreement.

> If the OWNER is not legally organized, or if after being duly organized it fails or refuses to adopt, ratify, and execute the [Permanent Agreement] within 30 days from the date it becomes legally organized and qualified to do so, or if for any other reason the project fails to proceed beyond the preliminary stage described in Section A–1 thru 5, inclusive, of said Agreement, the INTERIM PARTIES agree to pay ENGINEER for such preliminary engineering services an amount not to exceed the sum specified therefor in Section B–1 of said Agreement.

Donald Sayre executed the Interim Agreement on behalf of Plaintiff as "ENGINEER." Wayne Kurtz, Maurice Atkins, and Max Kurtz (steering committee members) executed the Interim Agreement as "INTERIM PARTIES."

On September 26, 1995, the Missouri Department of Natural Resources approved the preliminary engineering report submitted by Plaintiff for the project. In December of 1995, Plaintiff submitted and was subsequently compensated for a $4,000 invoice for preliminary work on the project. Plaintiff thereafter continued to perform engineering services for the project.

On August 21, 1997, Donald Sayre, Plaintiff's lead engineer on the water supply district project, passed away. Following his death, his son Cary Sayre and others affiliated with Plaintiff continued

work on the project. Plaintiff's work on the project continued until 1998 when, as explained below, the Water District entered into a permanent contract with another engineering firm for the construction of the water supply system.

**II. Public Water Supply District No. 1 of Holt County, Missouri:** On December 26, 1996, attorney James Farley, on behalf of Holt County residents, filed in the Circuit Court of Holt County, Missouri, a Petition under Chapter 247 of the Missouri Revised Statutes for the statutory formation of a public water supply district. The matter was set for hearing, and certain residents filed exceptions from the water supply district.

On February 5, 1997, the Circuit Court of Holt County, Missouri, entered its "Interlocutory Decree and Judgment Incorporating Water Supply District." According to statute, the court appointed Phil Graves, Matt Clifton, Kent Kurtz, Wayne Kurtz, and John Dudeck to the first Board of Directors of the Water District. The court's decree set an election date of April 1, 1997, for voters residing within the boundaries of the district to vote on the proposition as to whether the District should be incorporated.

The election was held, and a majority of the voters assented to the Water District's incorporation. Thus, on May 13, 1997, the Circuit Court of Holt County, Missouri, entered its Order declaring the Decree of Incorporation of the Public Water Supply District No. 1 of Holt County, Missouri, to be final and conclusive. On June 9, 1997, the decree of incorporation was filed with the Missouri Secretary of State.

The court-appointed Board of Directors held its first meeting on July 1, 1997, at which they elected to serve as officers: John Dudeck, President; Wayne Kurtz, Vice President; Rick Bottoms, Clerk; and Max Kurtz, Treasurer. Minutes from the meeting indicate, among other things, that Cary Sayre, appearing on behalf of Plaintiff at the meeting, discussed with the Board the engineering aspects of the water supply system's construction and addressed the question of constructing it in phases, rather than all at one time. Cary Sayre expressed his concern that construction in phases would cause changes in the engineering plan and increase the cost of the total project. Russell Grubaugh, on behalf of the United States Department of Agriculture (USDA), which replaced the FHA, also attended the meeting. Cary Sayre was asked to write, and wrote two days later, a letter to Mr. Grubaugh detailing why the Water Distribution Project should not be constructed in phases. The Board also discussed other engineering aspects of the project with Cary Sayre.

The evidence showed that both prior to and following the incorporation of the Water District, Plaintiff provided engineering services such as reports, feasibility studies, preliminary plans, cost estimates, and redesigns of system elements. But, the Water District never executed the Permanent Agreement after it became legally incorporated. Wayne Kurtz admitted that at the time the Interim Parties signed the Interim Agreement in 1995, they intended that if and when it was incorporated, the Water District would adopt, ratify, and execute a permanent agreement for engineering services with Plaintiff. However, he explained that Donald Sayre's death two years later, just a few months after the Water District's incorporation, led to the Board's concerns about Plaintiff's ability to continue work on the project without Donald Sayre's participation.

In June of 1998, Rick Bottoms, the Water District's clerk, opined that the Permanent Agreement was invalid. That same month, Kenneth Baker of Bartlett & West Engineering Co. approached John Dudeck,

President of the Water District, to express his company's interest in providing engineering services for the public water supply district project. Mr. Baker followed up on their conversation with a letter to Mr. Dudeck on July 9, 1998.

On August 4, 1998, the Water District placed a "Request for Qualifications Professional Engineering and Construction Inspection Services." The next day, John Dudeck asked Mr. Farley to review the Permanent Agreement and provide his legal opinion as to its validity. In a letter dated August 6, 1998, Mr. Farley advised the Water District that, in his legal opinion, the Permanent Agreement was unenforceable because (1) it was executed before the Water District came into being and was never formally ratified or otherwise adopted by the Water District after it was incorporated in 1997; and (2) it had not been approved by the FHA.

On September 8, 1998, the Water District interviewed four engineering firms, including Plaintiff. The Board ultimately awarded the permanent contract to Bartlett & West Engineering.

### III. PLAINTIFF'S PETITION:

On January 7, 2002, Plaintiff filed its petition in three counts, which can be summarized as follows:

**A. Count I:** In Count I, Plaintiff alleged breach of contract against the Water District and the Interim Parties (Wayne Kurtz, Maurice Atkins, and Max Kurtz). Plaintiff claimed: (1) the Interim Parties breached the Interim Agreement by failing to pay Plaintiff for all engineering and related services performed under the contract; (2) the Interim Agreement required the Water District to adopt, ratify, and approve the Permanent Agreement and the named Defendants breached the agreement by failing to do so; and (3) the Water District, through the action of its board members, ratified the Permanent Agreement both before and after the Water District was incorporated, and its subsequent actions were a breach of that agreement. Plaintiff pleaded it sustained damages "in that it [had] not been fully paid for the work it performed, and it [had] been damaged by the profits it would have received upon completion of the contract," which damages exceeded $150,000.

**B. Count II:** In Count II, Plaintiff brought a claim against John Dudeck, Rick Bottoms, James Farley, Bartlett & West Engineers, Inc., and John Conway (Bartlett & West's attorney) alleging that their conduct "constitute[d] a tortious interference with the contracts between Plaintiff and Defendants, Water District [and the Interim Parties], and an interference with Plaintiff's business expectancies arising from the contracts." Plaintiff sought damages in excess of $150,000 and punitive damages in excess of $500,000 against each of the named Defendants.

**C. Count III:** Plaintiff brought Count III "in the alternative to Counts I and II, in the event that the court subsequently determine[d] that the [Permanent Agreement and Interim Agreement were] not binding, valid, enforceable contracts." It is a claim for fraud against Wayne Kurtz, Maurice Atkins, Max Kurtz (the Interim Parties), and Rick Bottoms. Plaintiff alleged that these Defendants fraudulently misrepresented they would insure the Water District would take action to adopt, ratify, and approve the Permanent Agreement. Plaintiff sought damages for lost profit damages in excess of $150,000 and punitive damages in excess of $500,000 against each of the named Defendants.

Three separate answers were timely filed by the Defendants named in the petition: Defendants Water District, Rick Bottoms, Wayne Kurtz, Maurice Atkins, John Dudeck, and Max Kurtz jointly filed a

separate answer, which they subsequently supplemented; Defendants Bartlett & West and John Conway jointly filed a separate answer to the Petition; and James Farley filed a separate answer. Discovery ensued.

## IV. SUMMARY JUDGMENT:

**A. Defendants' Motions for Summary Judgment:** Not long after the Petition was filed, all Defendants moved for summary judgment within a month of each other.[5] The trial court heard oral argument on the motions on August 7, 2002.[6]

Prior to argument on the motions, the court addressed preliminary matters. Defendants Bartlett & West and John Conway agreed it was premature to hear their summary judgment motion, which had been filed less than thirty days earlier, so the hearing on their motion was moved to September 4, 2002. Plaintiff also sought to file a response to the Water District Defendants' motions for summary judgment, a motion for extension of time to respond to the summary judgment motions at issue, and a notice to strike the hearing on those motions. Counsel for the Water District and the individual Defendants associated with the Water District and counsel for Mr. Farley both objected to Plaintiff's filing requests. After considering those issues, the trial court ruled those Defendants' summary judgment motions were ripe for hearing but agreed to let Plaintiff file materials out of time "to be

... taken into account as far as the Water District motion." Those materials included Richard Rhodes' affidavit and Plaintiff's suggestions of law and responses to the Water District's statement of undisputed facts. The court proceeded on the remaining motions for summary judgment.

**B. The Trial Court's Judgments:** On August 15, 2002, the trial court entered summary judgment in favor of the Water District, Rick Bottoms, Wayne Kurtz, Maurice Atkins, John Dudeck, Max Kurtz, and James Farley. Consequently, Defendants Bartlett & West and Mr. Conway moved to quash Plaintiff's pending deposition notices and to proceed on their motion for summary judgment. Plaintiff opposed the motions but agreed that if the court granted the motion to quash, the remaining summary judgment motion could be determined on the basis of the pleadings. On August 23, 2002, the trial court granted Bartlett & West's and Mr. Conway's joint motion to quash and entered summary judgment in their favor.

The following is a summary of the court's two summary judgments as they relate to and dispose of all three counts in Plaintiff's Petition against all of the various Defendants:

**Count I:**

**a. Breach of the Permanent Agreement by the Water District:** The court held, as a matter of law, that the re-

---

**5.** (1) The Water District filed its motion on June 26, 2002; (2) Defendants John Dudeck, Rick Bottoms, Wayne Kurtz, Maurice Atkins, and Max Kurtz, who were represented by the same counsel as the Water District and who filed a "Joint Appendix of Exhibits" with the District, also filed on June 26, 2002. On July 9, 2002, the Water District Defendants supplemented their joint appendix of exhibits by filing the minutes of the July 1, 1997, meeting of the Board of Directors, which appendix had been used as an exhibit during Richard Rhodes' deposition and was still in the posses-

sion of the court reporter at the time the Water District Defendants moved for summary judgment; (3) Defendant James Farley filed his motion on July 5, 2002; and (4) Bartlett & West and John Conway jointly filed their motion on July 12, 2002.

**6.** Counsel for the Water District indicated to the trial court at the hearing that the matter was being expedited because the funding for the District was on hold and would not be released until the lawsuit was settled.

quirements of section 432.070 RSMo 1994, were not complied with, so the contract was invalid. Specifically, the court found: "Aside from the applicable statutory requirements, the contract document itself preclude[d] Plaintiff's assertion that Mr. Kurtz did not have to execute the [Permanent Agreement] **after** the Water District became legally organized." It was "undisputed that the Water District—by Mr. Kurtz or anyone else who would have been duly authorized—did not execute the [Permanent Agreement] after the Water District became duly organized," so it was unenforceable against the Water District. Moreover, the court found the FHA did not sign the Permanent Agreement, and the unsatisfaction of that condition precedent also rendered the Permanent Agreement invalid. And, even if the FHA had executed the contract, it would not be enough to bind the Water District, which never assented to it.

**b. Breach of the Interim Agreement by the Interim Parties:** The court found there was no breach. Specifically, the court held, "[t]he payment for the preliminary engineering services required by that Interim Agreement was paid by or on behalf of the Interim Parties to the Plaintiff in January 1996, and such payment was accepted by Plaintiff. Accordingly, there is no evidence before the Court to support a breach of the Interim Agreement by the Interim Parties."

**Count II—Tortious Interference:**

The court determined, as a matter of law, that the Permanent Agreement was invalid, and there was no breach of the Interim Agreement, which had been fully satisfied. Thus, there could be no tortious interference.

**Count III—Fraud:**

The court held the required legal elements of fraud could not be established as a matter of law. Specifically, it found no evidence of a false representation, and Plaintiff's assertions to the contrary were "misplaced and otherwise not supported by the clear and unequivocal language of the Interim Agreement."

This appeal follows.

### Standard of Review

■ If the movants "show that there is no genuine issue as to any material fact and that [movants are] entitled to judgment as a matter of law," then summary judgment is appropriate. Rule 74.04(c)(3);[7] *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993). As explained by the Missouri Supreme Court:

[Appellate] review [of a summary judgment] is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*Id.* at 376 (citations omitted). "Facts set forth by affidavit or otherwise in support of [Defendants'] motion[s] are taken as true unless contradicted by [Plaintiff's] response[s] to the summary judgment motion[s]." *Id.* However, because "[s]ummary judgment is a drastic remedy, bordering on a denial of due process and effectively denying the opposing party a day in court," this court will review the record and all reasonable inferences

---

**7.** Rule references are to the Missouri Rules of Civil Procedure (2002).

therefrom in a light most favorable to Plaintiff, the non-moving party. *Bellon Wrecking & Salvage Co. v. Rohlfing*, 81 S.W.3d 703, 705 (Mo.App. E.D.2002).

As defending parties, Defendants, in their separate motions, could employ one or more of three means to establish their right to judgment as a matter of law: They could (1) present undisputed facts that negate any one of the Plaintiff's required proof elements; (2) demonstrate that Plaintiff, after an adequate period of discovery, has not produced, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of one or more of Plaintiff's proof elements; or (3) show there is no genuine dispute as to the existence of each of the facts necessary to prove a properly pleaded affirmative defense. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. We will affirm the summary judgment "on any ground supported by the record, whether relied upon by the trial court or not." *Payne v. City of St. Joseph*, 58 S.W.3d 84, 86 (Mo.App. W.D.2001).

## Discussion

### Count I: Breach of Contract

■ To succeed on its claim for breach of contract against the Water District, Plaintiff must establish: "(1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages." *White v. Pruiett*, 39 S.W.3d 857, 861–62 (Mo.App. W.D.2001).

■ **A. The Permanent Agreement:** Plaintiff's first three points on appeal challenge the propriety of summary judgment in favor of the Water District on the Permanent Agreement. In its first point on appeal, Plaintiff actually raises two sub-arguments: First, Plaintiff contends that, even though the Water District never executed the Permanent Agreement, substantial compliance with section 432.070 is sufficient to establish a valid and enforceable contract, and, because there were issues of fact concerning the Permanent Agreement's substantial compliance with the statute, summary judgment is not proper. Second, Plaintiff contends that the Permanent Agreement is valid because the Water District ratified the contract after incorporation through the actions of its board members and directors. As explained below, we disagree and find the Permanent Agreement unenforceable against the Water District. Because Plaintiff cannot establish the first element of its breach of contract claim—the existence of a valid contract—summary judgment is appropriate on Count I as it relates to Plaintiff's claim that the Water District breached the Permanent Agreement.

The parties acknowledge that the Water District is a municipal corporation, and both assert that section 432.070 applies to the Permanent Agreement. Section 432.070 provides:

> No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing.

In *Public Water Supply District No. 16 v. City of Buckner*, 44 S.W.3d 860, 864 (Mo. App. W.D.2001), this court explained:

The purpose of [section 432.070] is to protect the governmental entity upon which another seeks to impose or enforce some claimed contractual obligation or agreement. It is not for the protection of the person seeking to impose the contractual agreement upon the governmental entity. The statutory requirements are mandatory, not directory.

(Citations omitted.) We then recognized, "[n]evertheless, substantial compliance may, *in some circumstances,* be sufficient." *Id.* (emphasis added) (citing *Veling v. City of Kansas City,* 901 S.W.2d 119, 124 (Mo.App. W.D.1995)). Plaintiff argues there are issues of fact as to whether the Permanent Agreement substantially complies with section 432.070. The Water District insists the Permanent Agreement is invalid because it did not strictly comply with the mandatory statutory provisions.

Although the statutory provisions of section 432.070 are mandatory, Missouri courts have recognized some circumstances under which the purposes of section 432.070 may be met by "substantial compliance" with its mandatory provisions.[8] However, we need not decide the issue of substantial compliance with section 432.070 in this case; as explained below, we find Plaintiff cannot establish an enforceable contract under basic contract principles.

 What cannot be overlooked is the basic legal premise that the application of section 432.070 presupposes the existence of a municipal corporation as a party to the contract. We look to the time when the contract was allegedly formed to determine its validity. Here, there is no dispute that when the Permanent Agreement was signed in May of 1995, the Water District, the party Plaintiff seeks to hold accountable as OWNER under the Permanent Agreement, was not a legal entity. Of course, "the rules relating to contracts generally apply to agreements to which a municipal corporation is a [purported] party." 10 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 29.02, at 238 (3rd ed.1999). Basic contract principles dictate:

> To form a contract, it is necessary that there be a party capable of contracting and a party capable of being contracted with. In other words, to enter into a valid, legal agreement, the parties must have the capacity to do so.... Where there is no capacity to understand or agree, there can be no contract. Also, it has been said that there can never be a valid, enforceable agreement unless both of the contracting parties are juristic entities at the time of its supposed consummation.

17A Am.Jur.2d, *Contracts* § 23 (1991). The Water District did not legally exist and could not contract with any person or authorize any person to contract on its behalf until more than two years after the Permanent Agreement was signed. Without two capable parties to the contract, there could be no valid, enforceable contract. *Id.; see also Cont'l Cas. Co. v. Campbell Design Group, Inc.,* 914 S.W.2d 43, 44 (Mo.App. E.D.1996) (citing 17A C.J.S. *Contracts* § 520 (1963) in explaining the basic legal premise that "a contract generally binds no one but the parties thereto, and it cannot impose any contractual obligation or liability on one not a party to it").

---

8. For additional cases recognizing substantial compliance with section 432.070, see the cases relied upon by Plaintiff: *Lynch v. Webb City School District No. 92,* 418 S.W.2d 608, 613–14 (Mo.App.1967), and *Wiseman v. Jr. College District of St. Louis,* 916 S.W.2d 267, 269 (Mo.App. E.D.1995).

Plaintiff cites cases such as *Township Committee of Edgewater Park v. Edgewater Park Housing Authority*, 187 N.J.Super. 588, 455 A.2d 575 (Law Div. 1982), in support of its argument that the Water District, subsequent to its incorporation, ratified the contract by requesting and accepting additional engineering services, which services Plaintiff argues fall under the provisions of the Permanent Agreement. However, *Edgewater Park* and other cases relied upon by Plaintiff in arguing that the Water District ratified the Permanent Agreement are distinguishable in that those cases involved ratification by established municipal bodies that were capable of contracting at the time but exercised the power in an irregular manner. Here, the Water District was not a legal entity and had no capability of contracting in May of 1995, when the Permanent Agreement was signed. As a matter of law, there was no contract to ratify.

Plaintiff seems to suggest that the Water District's eventual capacity to contract operates retrospectively to create a contract where none existed. Specifically, Plaintiff contends that because Wayne Kurtz, who signed the Permanent Agreement in May of 1995, ultimately became a board member of the Water District after its incorporation in 1997, he was not required to sign the Permanent Agreement a second time, and the Water District is bound thereby. Plaintiff cites no authority in support of this contention, and we fail to see how the Permanent Agreement could be automatically revived by the statutory incorporation of the Water District two years later. Even if we were to accept that the contract could be ratified, based on Mr. Kurtz's signature prior to the Water District's incorporation, which we do not, "[f]or effective ratification, it is [ ] essential that the principal [ (the Water District) ] should have been an ascertained person competent to enter into the transaction at the time when the supposed agent acted...." 12 RICHARD A. LORD, WILLISTON ON CONTRACTS § 35:35, at 296 (4th ed.1999). In 1995, the Water District was not an "ascertained person competent" to enter into the Permanent Agreement when Mr. Kurtz signed the agreement as its purported agent. After incorporation, the Water District did not "adopt, ratify and execute" the Permanent Agreement under the formal auspices of the statutes governing its creation and section 432.070.[9]

Having so held, we need not address Plaintiff's second and third points on appeal, in which Plaintiff challenges the trial court's alternate grounds for granting summary judgment to the Water District on the Permanent Agreement. Because the undisputed facts negate one of Plaintiff's required proof elements for its breach of contract claim—the existence of a contract—summary judgment is proper for the Water District on the Permanent Agreement under Count I of Plaintiff's petition.

**B. The Interim Agreement:** In Plaintiff's fourth point on appeal, it challenges the propriety of summary judgment on its

9. Once legally incorporated under the provisions of sections 247.010 to 247.220, section 247.050 conferred upon the Water District the power to "contract and be contracted with." Section 247.060.1 provides that the Water District acts by and through the members of its Board of Directors; section 247.080.2 gave *the Board* the power, and made it the Board's duty, "to employ necessary help and to contract for such professional service as the demands of the district require in creating and operating a waterworks system contemplated by [Chapter 247]"; section 247.080.5 mandated that all contracts made by the district conform to section 432.070; and section 247.090 required a majority of board members to authorize the contract for it to be valid.

claim that the Interim Parties breached the Interim Agreement. Plaintiff brings this point in the alternative to Points I, II, and III, explaining, "the [I]nterim [A]greement applies only if the [Permanent Agreement was] not ratified, adopted and executed by the Water District."

As previously set forth, the Interim Agreement provides:

> If the OWNER is not legally organized, or if after being duly organized it fails or refuses to adopt, ratify, and execute the [Permanent Agreement] within 30 days from the date it becomes legally organized and qualified to do so, or if for any other reason the project fails to proceed beyond the preliminary stage described in Section A–1 thru 5, inclusive, of said Agreement, the INTERIM PARTIES agree to pay ENGINEER for such preliminary engineering services an amount not to exceed the sum specified therefor in Section B–1 of said Agreement....

Section B–1 provided that Plaintiff was to receive $10 per meter sign-up for its preliminary work. Once it became a legal entity, the Water District did not adopt, ratify, or execute the Permanent Agreement, so the Interim Parties are obligated under the Interim Agreement to pay Plaintiff for the preliminary engineering services it performed. Plaintiff maintains disputed issues of fact exist as to whether it received full payment under the Interim Agreement when it was paid $4,000 (400 users at $10 per user) because "[t]here are clearly issues of fact as to whether at least 453 users were signed-up by July 1, 1997."

█ The Interim Parties first argue that Plaintiff's breach of contract claim on the Interim Agreement is barred by the doctrine of accord and satisfaction. In support of this argument, they state that in December of 1995, Plaintiff submitted a $4,000 invoice, representing 400 meter sign-ups. Rick Bottoms then sent a $4,000 check to Plaintiff; the check was marked "payment in full." Plaintiff cashed the check and never submitted any additional invoices. As a result, the Interim Parties assert "[t]o the extent that [Plaintiff] now contends that [453 users signed up] instead of 400, its acceptance of the Water District's check tendered on the express condition that it was for "payment in full" constitutes an accord and satisfaction." However, the $4,000 was for payment in full for users signed up as of December 1995. While Plaintiff might be barred by accord and satisfaction from seeking additional compensation for any sign-ups occurring up to and including the date of the invoice, viewing the evidence in a light most favorable to Plaintiff, there is at least some evidence that Plaintiff continued to do preliminary engineering work after that date under the Interim Agreement and that additional users were signed up as a result. Accord and satisfaction would not bar Plaintiff's request for compensation for those additional sign-ups.

The Interim Parties argue further that, by the terms of the Interim Agreement, they "are not liable for the $10 per meter sign up until 'after the review of the preliminary engineering report by the FHA and acceptance by the OWNER.'" They claim Plaintiff "did not present any facts to establish that either of these conditions precedent were ever satisfied[, and] [o]n these grounds alone, the trial court's judgment may be affirmed." Viewing the evidence in a light most favorable to Plaintiff, we believe there was at least some evidence that the FHA reviewed Plaintiff's preliminary engineering report and that the Water District accepted it. For example, there was evidence that in order to obtain funding from the FHA (now the USDA) to create the Water District, which it apparently did, the preliminary report had to have been reviewed by the FHA

and accepted by the Water District.[10] There is also evidence the Water District was created with use of the preliminary engineering report. Plaintiff is entitled to the benefit of all reasonable inferences from the record. *Bellon Wrecking & Salvage Co.*, 81 S.W.3d at 705. It can be at least reasonably inferred from the evidence that the conditions precedent were satisfied.

We find that Plaintiff has presented at least some evidence raising a genuine issue of material fact as to the number of user sign-ups it is entitled to compensation for under the Interim Agreement. The evidence includes: handwritten minutes from the Water District's Board of Directors' first meeting in July of 1997 referencing "453 signed user Agreements"; a June 25, 1998, "Project Summary" prepared by Mr. Grubaugh of the USDA indicating 473 sign-ups after the first full year of the Water District's operation; and the affidavit of Mr. Rhodes indicating 453 sign-ups, which the trial court allowed "to be ... taken into account as far as the Water District motion."[11] Thus, in response to the Water District's motion for summary judgment, Plaintiff demonstrated specific facts showing there is a genuine issue of material fact concerning whether Plaintiff has been paid the full amount due for preliminary engineering services under the Interim Agreement. Accordingly, we reverse the trial court's summary judgment in favor of the Interim Parties on Plaintiff's claim that there was a breach of the Interim Agreement in that it was not paid in full under the contract for the sign-ups and remand for further proceedings on that claim.

## Count II: Tortious Interference

In its fifth point on appeal, Plaintiff claims that the trial court erred in granting summary judgment in favor of John Conway, Bartlett & West, John Dudeck, Rick Bottoms, and James Farley on its claim in Count II for tortious interference with contracts and business expectancies arising from the contracts on the grounds there was no contract or valid business expectancy. Plaintiff maintains there are disputed issues of fact as to whether (1) a contract existed between Plaintiff and the Water District, and (2) Plaintiff had an expectancy of a contract with the Water District.

■■■ The essential elements of a tortious interference with contract or business expectancy claim are: "(1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996). The trial court granted summary judgment after finding Plaintiff could not, as a matter of law, establish the first

---

**10.** Plaintiff points out in its reply brief: "Interestingly, Mr. Farley recommended that the Water District (not the interim parties) pay for all sign-ups under the Interim Agreement, because ... 'without such interim agreements, it would be difficult to get some projects under way, and certainly the fair thing to do is to pay that liability on behalf of the interim parties. [Mr. Farley was] sure that was the intention of all concerned at the time that the contract was executed.'"

**11.** The Water District asserts in its brief that the trial court plainly erred in allowing Plaintiff to file its response to its summary judgment motion and Mr. Rhodes' affidavit out of time. We perceive no abuse of the trial court's discretion in this matter, nor was it "plain error" to allow Plaintiff to file its response and supporting exhibits out of time. Even if it had been plain error to admit the affidavit, Plaintiff submitted other evidence creating a genuine issue of material fact as to the number of sign-ups for which payment was due under the Interim Agreement.

element of its tortious interference claim in Count II. We agree and affirm the trial court's summary judgment on Count II.

**I. Interference with Contracts:** In Count II of its Petition, Plaintiff alleges the named Defendants interfered with its contracts with the Water District and the Interim Parties. By its use of the plural "contracts" and the naming of the parties to both contracts, we assume Plaintiff sought to establish tortious interference with both the Interim and the Permanent Agreements.

With regard to the Interim Agreement, as explained above, there was no dispute the contract was valid—the only issue was whether the Interim Parties had breached the Interim Agreement by failing to pay Plaintiff the compensation it was entitled to thereunder. Plaintiff does not allege these Defendants' conduct induced or caused this alleged breach of the Interim Agreement, so we limit our discussion to the Permanent Agreement.

With regard to the Permanent Agreement, we have already found it invalid and not enforceable against the Water District. Because the undisputed facts negate the existence of a valid contract, there could be no tortious interference with the Permanent Agreement under Count II of Plaintiff's petition. Said in another way, "[t]here can be no liability for the breach of an invalid contract, and, of course, one cannot be charged with liability for inducing another to refrain from doing that which he was not legally bound to do." *Seitz v. Michel,* 148 Minn. 474, 181 N.W. 106, 106 (1921) (per curiam); *see also Fraidin v. Weitzman,* 93 Md.App. 168, 611 A.2d 1046, 1057 (1992) (explaining "the general rule is that 'for there to be a right of action against one for contractual interference, there must be in existence a valid contract subject to that interference' ") (citing *Armendariz v. Mora,* 553 S.W.2d

400 (Texas Civ.App.1977), and James O. Pearson, Jr., Annotation, *Liability for Interference with Invalid or Unenforceable Contract,* 96 A.L.R.3d 1294, 1297, 1980 WL 130880 (1980), which is premised by the statement, "All of the cases in this annotation involving invalid contracts support the view that, regardless of the particular ground for invalidity ... there is no liability for interfering with an invalid contract.").

**II. Interference with Business Expectancies:** Plaintiff claims, however, that even if the Permanent Agreement is invalid, there are genuine issues of material fact as to whether it had a valid business expectancy in the water supply district engineering project, with which the Defendants interfered, so the court erred in granting summary judgment on Count II of its petition.

In Count II of its petition, Plaintiff also asserts the named Defendants' conduct "constitutes a tortious interference with ... Plaintiff's business expectancies *arising from the contract attached [t]hereto* [ (the Permanent and Interim Agreements) ].... " (Emphasis added.) Plaintiff claimed no business expectancy independent of the contracts. Regarding the Interim Agreement, as explained above, that contract was completed, but Plaintiff argues it was not paid in full under the contract. There could be no tortious interference with any business expectancy arising from the Interim Agreement. Plaintiff got the preliminary engineering business it expected from the Interim Agreement; only the issue of whether it was fully paid for such business remains. Thus, summary judgment is appropriate on Plaintiff's claim of tortious interference with the Interim Agreement or any business expectancy arising therefrom. The remainder of our discussion will focus on tortious interference with business expectancies arising from the Permanent Agreement.

Missouri law provides, "a reasonable *expectancy* of a commercial relationship is protected from unjustified interference, and there is no requirement that the business be based upon a valid contract.... '[O]ne who intentionally and improperly interferes with another's *prospective* contractual relation (except a contract to marry) is subject to liability....'" *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 13 (Mo.App. S.D.2002) (quoting RESTATEMENT (SECOND) OF TORTS, § 766B (1979) (other citations omitted), "with which Missouri cases are in accord").[12] Here, however, the question arises: can these Defendants be held liable for interference with business expectancies that Plaintiff claims arose out of a contract found to be invalid, or, can Plaintiff's business expectancies claimed to have arisen out of the Permanent Agreement be "reasonable" as a matter of law? We think not. "In order to have a claim for interference with a valid business expectancy, it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with." *Gott v. First Midwest Bank of Dexter*, 963 S.W.2d 432, 438 (Mo. App. S.D.1998). Indeed, Plaintiff performed preliminary engineering work for the formation of the Water District, and Wayne Kurtz testified that in doing so, Donald Sayre indicated to Mr. Kurtz his company was "betting on the come." However, after completing the work under the Interim Agreement, Plaintiff could have no *reasonable* expectation it would also be awarded the permanent contract, at least not the type of expectation that could be *tortiously* interfered with. Plaintiff may have hoped its hard work paid off, but any interference with that hope simply would not be enough to impose liability against the Defendants here. The only valid contract, the Interim Agreement, merely "anticipated" that if it became a legal entity, the Water District would execute a permanent engineering contract with Plaintiff; and its provisions specifically provided that in the event the Water District either did not become a legal entity, or, if it did and refused or failed to execute a permanent contract, Plaintiff was entitled only to payment for the preliminary engineering services performed thereunder. This is not sufficient to impose liability upon the allegedly interfering Defendants. Plaintiff could not, as a matter of law, have a reasonable, valid business expectancy alleged to have arisen out of a contract that is unenforceable, such as we have declared the Permanent Agreement.

Accordingly, because the undisputed facts negate a necessary element of Plaintiff's tortious interference claim—a contract or valid business expectancy—Defendants are entitled to summary judgment on Count II of the petition.

### Count III: Fraud

In its sixth and final point on appeal, Plaintiff claims the trial court erred in

---

12. For further discussion on interference with business expectancies, see: *Eib v. Federal Reserve Bank of Kansas City*, 633 S.W.2d 432, 435–36 (Mo.App.1982), recognizing that "in an action for interference with a contractual relationship, it is not necessary that there be a binding contract in existence, but a probable future business relationship from which there is a reasonable expectancy of financial benefits is enough"; and Joel E. Smith, Annotation, *Liability of Third Party for Interference with Prospective Contractual Relationship Between Two Other Parties*, 6 A.L.R.4th 195, 1981 WL 167431 (1981) (section 4, which is not relevant here, is explicitly superceded by Richard D. English, *Liability for Tortious Interference With Prospective Contractual Relations Involving Sale of Business, Stock, or Real Estate*, 71 A.L.R. 5th 491, 1999 WL 729011 (1999)).

granting summary judgment in favor of Defendants on its fraud claim in Count III of its petition. In support, Plaintiff contends disputed issues of fact exist as to whether (1) Defendants Wayne Kurtz, Maurice Atkins and Max Kurtz (the Interim Parties who signed the Interim Agreement) and Rick Bottoms falsely represented the Water District would promptly take such action as necessary to adopt, ratify, execute and become bound by the Permanent Agreement, after it became a legal entity, (2) at a time when they did not intend that such actions would be taken by the Water District.

In Missouri, the elements of fraud are:

1) a representation, 2) its falsity, 3) its materiality, 4) the speaker's knowledge of its falsity, or his ignorance of its truth, 5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated, 6) the hearer's ignorance of the falsity of the representation, 7) the hearer's reliance on the representation being true, 8) his right to rely thereon, and 9) the hearer's consequent and proximately caused injury.

*Sofka v. Thal,* 662 S.W.2d 502, 506 (Mo. banc 1983). If the Defendants presented undisputed facts that negate any one of these required proof elements, or if they demonstrated that Plaintiff, after an adequate period of discovery, has not produced and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of one or more of these proof elements, then they are entitled to summary judgment. *ITT Commercial Fin. Corp.,* 854 S.W.2d at 381.

In Count III of its petition, Plaintiff contends that the named Defendants represented *they* would take all necessary steps for the Water District to adopt, ratify, and execute the Permanent Agreement

once the Water District became a legal entity, but they had no intention of doing so at the time they entered into the Interim Agreement. Although Plaintiff's petition and argument in its brief focus on what actions the individual Defendants allegedly falsely represented *they* would take, in Point IV of its appeal, Plaintiff's claim is that these Defendants falsely represented *the Water District* would promptly take such necessary action as to become bound by the Permanent Agreement once the Water District became a legal entity. Pursuant to Rule 84.04, we are limited to addressing only those alleged errors raised in the points relied on; that is, we review Plaintiff's claim of fraud for the individual Defendants' representations as to what the Water District would do in the future.

As set forth above, to satisfy the eighth element of its fraud claim, Plaintiff must plead and prove it had a right to rely on the allegedly false misrepresentations. In paragraph forty-seven of its petition, Plaintiff merely avers that it "reasonably, detrimentally, relied upon" the Defendants' false representations. Plaintiff did not plead any right to rely on the allegedly false representations, nor did it assert ultimate facts demonstrating its right to rely on the allegedly false representations. Plaintiff also failed to plead the third (material representation), fifth (Defendants' intent the representation be acted on), and sixth (Plaintiff's ignorance of the falsity of the representation) elements of a fraud claim. Rule 55.15 provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and any other condition of mind of a person may be averred generally." This failure to plead specific elements of its fraud claim renders Count III of Plaintiff's petition subject to dismissal.

*Mullen v. G.M.A.C.,* 919 S.W.2d 7, 8 (Mo. App. W.D.1996).

■■■ Nonetheless, we have considered Plaintiff's claim on appeal that the court erred in entering summary judgment on its fraud claim. Even considering the record in a light most favorable to Plaintiff, as we must, we hold that *at the time the representations were allegedly made,*[13] as a matter of law, Plaintiff had no right to rely on any representation by the individual Defendants as to what the *Water District* might do in the future.

As previously discussed in our consideration of the validity of the Permanent Agreement, in May of 1995, when the allegedly false representations were made, the Water District was not a legal entity. In fact, as indicated by the language of the Interim Agreement, there was a possibility the Water District might never become a legal entity. Plaintiff knew, or should have known, that if and when the Water District was statutorily incorporated under Chapter 247, these Defendants had no control over who would be appointed as an officer or director of the Water District. The appointment of the initial board members is strictly within the control of the circuit court that approves the formation of a water district. § 247.060.2. Although the Water District was ultimately formed and certain of the defendants were ultimately appointed to serve on the Board and others served as officers of the Board, at the pertinent time (when the representations were made), it was beyond these Defendants' control whether the Water District would even be formed, and, even if it were formed, whether they would ultimately become board members or officers of the district with any authority to bind the Water District to the Permanent Agreement.

In this regard, Defendants cite *Eureka Pipe, Inc. v. Cretcher–Lynch & Co.,* 754 S.W.2d 897, 898–99 (Mo.App. W.D.1988), in which this court held the plaintiff had no right to rely upon the defendant brokers' representations that a surety would issue a bond when the brokers were not employees of any bonding company; they had no authority to bind any bonding company; and the bonding companies themselves would approve or disapprove the execution of bonds. Although *Eureka Pipe* involved doctrines related to principals and sureties, we find its application of the rule that "a statement is not actionable that an independent third person (the surety company) will do some particular thing," applicable in this situation. *Id.* at 899. Defendants' alleged statements or representations to Plaintiff that an independent third person (the Water District) would execute the Permanent Agreement after it became a legal entity are not actionable for fraud.

We recognize the Interim Agreement does provide that Plaintiff and the Interim Parties "anticipated" the Water District would execute the Permanent Agreement. However, any "anticipation" of execution is not equivalent to a representation that the Water District *had to* execute it; it is more akin to a promise, the breach of which does not create an action for fraud. *City of Fenton,* 740 S.W.2d at 339 (citing *Sofka,* 662 S.W.2d at 507).

Under the circumstances of this case, Plaintiff cannot establish, as a matter of law, it had a right to rely upon the allegedly fraudulent representations made by the named Defendants. Accordingly, summary judgment on Count III of Plaintiff's petition is appropriate.

---

**13.** *See City of Fenton v. Executive Int'l Inn, Inc.,* 740 S.W.2d 338, 339 (Mo.App. E.D. 1987) (the allegedly fraudulent representations must be considered in light of the circumstances as existed *"at the time they were made"*).

## Conclusion

For the foregoing reasons, summary judgment is appropriate on all of Plaintiff's claims in its petition except its claim that the Interim Parties breached the Interim Agreement. The trial court's summary judgment on that issue is reversed and remanded to the trial court for proceedings consistent with this opinion.

ULRICH, P.J., and NEWTON, J., concur.