# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3662

_____

Lackawanna Chapter of the Railway &   *
Locomotive Historical Society, Inc.;   *
Friends of the New Jersey Railroad and   *
Transportation Museum Commission,   *
Inc.,   *
  *   Appeal from the United States
     Plaintiffs – Appellants,   *   District Court for the
  *   Eastern District of Missouri.
    v.   *
  *
St. Louis County, Missouri, doing   *
business as Museum of Transportation,   *
  *
     Defendant – Appellee.   *

_____

Submitted: April 10, 2007
Filed: August 14, 2007

_____

Before MURPHY, BRIGHT, and BENTON, Circuit Judges.

_____

BRIGHT, Circuit Judge.

This case involves a dispute over the possession of an artifact from the Golden Age of passenger rail travel in the United States. The artifact is not a simple souvenir; the Lackawanna Chapter of the Railway & Locomotive Historical Society, Inc. ("Lackawanna"), seeks the return of a historic steam locomotive, currently displayed by St. Louis County, Missouri ("St. Louis"), at its Museum of Transportation.

Lackawanna filed suit in federal district court, but the court granted summary judgment for St. Louis. That court rejected Lackawanna's claims for replevin and specific performance on the gounds that the record did not demonstrate the existence of an enforceable loan agreement governing the locomotive. This appeal by Lackawanna followed.

## I.

The parties to this suit, Lackawanna and St. Louis, are each successors to the entities that have owned and possessed Delaware, Lackawanna & Western Railroad's ("the Railroad") engine No. 952 over the past century. The Railway & Locomotive Historical Society ("Historical Society") is the national organization, incorporated in Massachusetts, which received No. 952 from the Railroad in 1939. The Historical Society transferred ownership of No. 952 to its Lackawanna Chapter in 1999, and that local society is thus the plaintiff-appellant here.

The National Museum of Transportation ("Transportation Museum") in St. Louis was a private non-profit corporation at the time it first displayed No. 952. St. Louis, the defendant-appellee here, exercised an option to acquire the Transportation Museum in 1984 after first acquiring through lease the museum's assets in 1979.

We recount separately the ownership of No. 952, possession of No. 952, and acquisition of the Transportation Museum by St. Louis.

A. Ownership of No. 952

In 1905 the Railroad's engine No. 952 entered service. No. 952, a now-rare "camelback" locomotive utilizing a wide firebox to burn anthracite coal, was retired in 1938 and thereafter began its second life as a stationary museum piece. On April 17, 1939, the Railroad transferred ownership of No. 952 to the Historical Society, for

exhibition as a museum piece. The 1939 transfer of No. 952 from the Railroad to the Historical Society is documented by a written agreement, signed by representatives of both parties.

In 1999 the Historical Society gave No. 952 to its Lackawanna Chapter (the plaintiff-appellant here) and the Friends of the New Jersey Railroad & Transportation Museum (which transferred its interest in No. 952 to Lackawanna during this litigation). The transfer is recorded in a gift deed.

B. Possession of No. 952

Despite the Railroad's transfer of No. 952 to the Historical Society in 1939, the engine remained in the Railroad's possession. Then, in 1952, the general manager of the Railroad, W.G. White, notified the Historical Society that the Railroad's plans to sell or lease its back stop at Scranton, Pennsylvania, would require the Historical Society to relocate No. 952. According to correspondence in the record, the impending loss of the back stop lead the Historical Society to "'sound out' the proper authorities in St. Louis and see if they would be interested in adding this locomotive to their collection" if "that group would want it in the nature of a permanent loan." The Historical Society offered the locomotive to the Transportation Museum in 1953 for "permanent exhibition."

The documents relating to the 1953 placement of No. 952 at the Transportation Museum include only correspondence. After the Historical Society learned in October 1952 that the Railroad would soon be unable to store the locomotive on its rails, Charles Fisher, president of the Historical Society, offered No. 952 to the Transportation Museum. John Smith, on behalf of the Transportation Museum, responded in a November 1952 letter:

[T]he members of the Board of Directors of the Museum of Transport have considered the matter of taking the Lackawanna Mother Hubbard No. 952, as temporary or permanent loan, if it is desired to send the locomotive here. Our group is unanimously in favor of accepting the engine for care and exhibition on a basis that will seem satisfactory in the judgment of the donor, for it is the purpose of this organization to preserve such items.

In subsequent correspondence, the Historical Society described the transfer as "permanent loan," and the Historical Society's 1954 President's Report stated that No. 952 would be "in the care" of the Transportation Museum in the "hope that 'her' wanderings will end." After receiving No. 952, the Transportation Museum undertook several immediate improvements, including restoring the paint and stenciling to No. 952's original design.

C. St. Louis's Acquisition of the Transportation Museum

The 1984 documents transferring the Transportation Museum's property to St. Louis include a warranty deed (for the real property) and a "Transfer Agreement and Bill of Sale" (for other property owned by the museum and property held by the museum subject to the rights of others). Regrettably, the record documents regarding the 1984 transfer do not mention No. 952.[1]

---

[1]The 1984 Transfer Agreement and Bill of Sale originally contained an "Exhibit 'B'", which listed "restricted property" that St. Louis agreed to accept subject to the "ownership rights of the persons listed on Exhibit 'B'." Though the parties generally refer to the Transportation Museum's "restricted property," we have not located the exhibit listing the property in the record, nor have the parties relied on it, to confirm whether No. 952 was listed. We express no opinion on the impact of the Transportation Museums's listing of, or failure to list, No. 952 when it delivered its assets to St. Louis.

D. The Dispute Regarding Possession of No. 952

At some point in or before October 1990 the Historical Society began its efforts to regain possession of No. 952. The correspondence, which included, at times, the Department of the Interior, the National Parks Service, the Smithsonian's National Museum of American History, the Office of the County Executive of St. Louis, the Transportation Museum, and the Historical Society, is extensive. Evidently, the Historical Society hoped to return No. 952 to its original home in Pennsylvania, for display at the Steamtown National Historic Site at Scranton, and also feared that the Transportation Museum's alleged neglect was endangering the locomotive. After reportedly leaving it to rust on an uncovered and overgrown sidetrack, the Transportation Museum began an effort to better maintain and preserve No. 952 in 1995, but that did not deter the Historical Society.

II.

Lackawanna, as the successor to the Historical Society's interest in No. 952, first brought suit in the Middle District of Pennsylvania, though that court transferred the case to the Eastern District of Missouri. See Lackawanna Chapter of Ry. & Locomotive Historical Soc., Inc. v. St. Louis County, 2004 WL 503447 (M.D. Pa. Mar. 12, 2004). St. Louis soon moved for summary judgment, arguing that the correspondence did not constitute a written agreement that could support Lackawanna's claim for specific performance, as required for contracts with counties by Mo. Rev. Stat. § 432.070. St. Louis also asserted other defenses, including Missouri's five-year statute of limitations for breach of contract claims, adverse possession of No. 952 by the Transportation Museum, and abandonment by the Historical Society and Lackawanna.

The district court granted St. Louis's motion for summary judgment. The court first found that "[n]one of the documents establish a loan agreement between the

RLHS [the Historical Society] and the [Transportation] museum setting forth the terms of the transfer of the locomotive in 1953." Next, the court observed that the available writings do not define "permanent loan." In the alternative, the court found that the Missouri statute of frauds, Mo. Rev. Stat. § 432.010, precluded interpreting the documents as an agreement. Finally, in the absence of an enforceable agreement, the court determined that St. Louis's possession of No. 952 created a presumption of ownership that Lackawanna did not rebut. See Ross v. Pendergast, 182 S.W.2d 307, 309 (Mo. 1944).

## III.

Because our jurisdiction in this case is premised on the diversity of the parties, we apply state substantive law. See Winthrop Res. Corp. v. Stanley Works, 259 F.3d 901, 904 (8th Cir. 2001). The district court, relying on the transfer of this case from the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1406(a), see Pony Computer, Inc. v. Equus Computer Sys. of Missouri, Inc., 162 F.3d 991, 995 (8th Cir. 1998), applied Missouri's choice of law doctrine and concluded that Missouri substantive law should govern this case. The parties have not challenged that determination, and thus we will also apply Missouri law.

In the district court this case turned on whether the correspondence between the Transportation Museum and the Historical Society created a loan agreement. The court determined that the correspondence did not, because the agreement was not in writing and failed to define the term "permanent loan."[2] See Marie C. Malaro, A

---

[2]The district court also relied on Mo. Rev. Stat. § 432.070, which requires that certain agreements with Missouri counties be in writing. See City of North Kansas City, Mo. v. Sharp, 414 F.2d 359, 363-64 (8th Cir. 1969). Application of § 432.070 implies that there is some agreement that St. Louis seeks to avoid because it is not in writing, and we interpret the district court's reliance on § 432.070 as another reason it found the correspondence in this case could not constitute a 1953 loan agreement

Legal Primer on Managing Museum Collections 165-67 (1985) (discussing the legal difficulties arising from the term "permanent loan"). The absence of a written loan agreement in 1953 does not, however, lead to the court's conclusion that Lackawanna failed to rebut the ordinary "presumption of ownership" arising from St. Louis's "exclusive possession and control" over No. 952, Ross, 182 S.W.2d at 309.

The district court — without confronting the unique legal doctrines that must be considered when a museum is party to a dispute over a piece of its collection — relied on vagaries of ancient documents and St. Louis's possession and control of No. 952 since 1953 to establish a presumption of *ownership* in favor of the St. Louis. See generally Sherry Hutt et al., Cultural Property Law 145-47 (2004) (discussing the complexities of managing loans, including "old loans," to museums). But it is not disputed that the Historical Society possessed title to No. 952 in 1953. By whatever agreement No. 952 was delivered to the Transportation Museum — whether fully embodied by the correspondence in the record or lost over the interceding half-century — our concern must be how a museum might *continue* to possess an artifact that it *has* possessed in its capacity as an institution regularly dedicated to the public display of the property of others.[3] See generally George E. Hartman, Jr., Peter G. Powers, & Judith L. Teichman, *Collection Objects of Uncertain Status: Indefinite Loans, Deposits, and Undocumented Objects — What Are the Museum's Alternatives?*, in

enforceable against St. Louis. We do not rely on the existence of a written agreement in 1953 and thus do not address the application of § 432.070 to these facts.

[3]Part of the difficulty in this case arises from St. Louis's apparent failure to avail itself of Missouri's Museum Property Act, 1991 Mo. Laws S.B. No. 344 (codified at Mo. Rev. Stat. § 184.101 et seq.). The legislature, recognizing the precise problem that has arisen in this case, established a procedure for museums to take title to property by terminating a loan, after giving notice to the lender or claimant (in the case of documented property), or the public (in the case of undocumented property). See Mo. Rev. Stat. §§ 184.111, .112. The parties have not cited the statutes in their briefs to this court. The Museum Property Act strengthens our view that, in the case of museums, simple possession may alone be insufficient to create a property interest.

ALI-ABA Course of Study: Legal Problems of Museum Administration 261-67 (1983).  When the period of display is indefinite, as it appears to be in this case, we cannot say that, without more, possession and control entitle the museum to a presumption of ownership or continued possession that overcomes a lender's good title.

The Transportation Museum, in its capacity as a museum, knowingly received No. 952 from the Historical Society, but St. Louis has not claimed that it, or the Transportation Museum before it, acquired actual title.  Cf. City of Chattanooga, Tenn. v. Louisville & Nashville R.R. Co., 298 F.Supp. 1, 9 (E.D. Tenn. 1969) (resolving dispute over continued display of Civil War locomotive in favor of railroad's desire to relocate, where railroad possessed title).  The uncoupling of title and possession in this case thus created an express or implied bailment for an indefinite period.  See, e.g., In re McCagg's Estate, 450 A.2d 414, 416 (D.C. 1982); see also Leonard D. DuBoff & Christy O. King, Art Law In a Nutshell 273-74 (2006) (discussing museum's status as bailee for loaned objects).  In the absence of a formal agreement, the indefinite bailment arises from the relationship between a lender and a museum and is terminable at will.  Cf. Truck Leasing Corp. v. Swope, 248 S.W.2d 84, 86 (Mo. Ct. App. 1952) ("bailment for an indefinite time is terminable at will").

Missouri recognizes the traditional concept of bailment:

> A 'bailment' in its ordinary legal sense imports the delivery of personal property by the bailor to the bailee who keeps the property in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished or that the property shall be kept until the bailor reclaims it.

Weinberg v. Wayco Petroleum Co., 402 S.W.2d 597, 599 (Mo. Ct. App.  1966); see also D.S. Sifers Corp. v. Hallak, 46 S.W.3d 11, 16 (Mo. Ct. App. 2001).  Though the

Transportation Museum was not a bailee for hire, a gratuitous bailment does not defeat the fundamental duties that attend the relationship, which include return of the bailed property. See Mason v. St. Louis Union Stockyards Co., 60 Mo. App. 93 (Mo. Ct. App. 1894); see also Norman Palmer, Art Loans 182-84 (1997) (discussing the duty of care owed by a museum acting as an "involuntary" bailee).

Understanding that the Transportation Museum originally possessed No. 952 as a bailed good, the question here is whether that bailment should give Lackawanna the opportunity to regain possession of No. 952. See Stone v. Crown Diversified Indus. Corp., 9 S.W.3d 659, 669 (Mo. Ct. App. 1999); see also 8A Am. Jur. 2d *Bailments* § 49. Lackawanna must "show notice to or knowledge of" the Transportation Museum that No. 952 was "in fact in [its] possession." Stone, 9 S.W.3d at 669. On this record there is ample correspondence demonstrating that the Transportation Museum knowingly accepted No. 952 from the Historical Society. At a minimum, therefore, the Transportation Museum's possession of No. 952 began as an implied bailment. See Stone, 9 S.W.3d at 669. Because "[a] contract for bailment may be written, oral, express or implied," id., St. Louis's statute of frauds argument is therefore without merit as it relates to the original bailment. But cf. Kan. Stat. Ann. § 33-104 (setting out a statute of frauds for bailments). But there are other issues that must be resolved, including operation of Missouri's statute of limitations, see generally Judith Bresler & Ralph E. Lerner, Art Law 1891-92 (2005) (discussing generally statutes of limitations and bailments), and the effect of transferring the Transportation Museum's bailed property to St. Louis. The record on these issues has not been developed, and therefore we leave them to be raised by the parties before the district court.

We recognize that the district court's analysis of this case will be complicated by St. Louis's dual role as a municipality and as a successor to the Transportation Museum's agreements. St. Louis has raised § 432.070 (requiring certain agreements with municipalities be in writing) in an attempt to avoid some unwritten agreement,

though we are uncertain how that argument may avoid an action in replevin arising from a bailment. Missouri courts have observed that a private party cannot enforce an agreement that violates § 432.070 against a county, even when the county acts as a bailee. See Crow Contracting Corp. v. George F. Smith Co., 407 S.W.2d 593, 599-600 (Mo. Ct. App. 1966). But any 1953 agreement, whether express or implied, could not have violated § 432.070 because St. Louis was not a party; the agreement would have been between two private parties. Rhodes Eng'g Co., Inc. v. Public Water Supply Dist. No. 1 of Holt County, 128 S.W.3d 550, 561 (Mo. Ct. App. 2004.) Here St. Louis is, at most, a successor to a 1953 agreement, which it *may* have acknowledged in its 1984 acquisition of the Transportation Museum. See note 1, supra. The 1984 writings have not been challenged under § 432.070.

Any absence of a writing may not limit Lackawanna, moreover, because this action is in replevin—St. Louis possesses No. 952—rather than for damages in bailment. See Scher v. Gilpin, 738 S.W.2d 900, 901 (Mo. Ct. App. 1987) (distinguishing action for damages in bailment from action in replevin); see, e.g., Castelli v. City of Bridgeton, 792 S.W.2d 909 (Mo. Ct. App. 1990) (successful action in replevin against municipality). But see Crow Contracting Corp., 407 S.W.2d at 599-600 (describing action for damages in bailment that could not be brought against city without written agreement). Thus, while bailment describes in part the circumstances leading to the Transportation Museum's possession of No. 952, it is for the parties and the district court to determine whether an action in replevin against St. Louis should result in No. 952's return to Lackawanna, the successor to the original bailor (the Historical Society). See, e.g., Pollock v. Brown, 569 S.W.2d 724, 731-32 (Mo. 1978) (en banc) (describing action in replevin to recover goods withheld by bailee).

Finally, the questions surrounding St. Louis's 1984 acquisition of the Transportation Museum are another wrinkle left unresolved by the record. The 1984 Transfer Agreement and Bill of Sale specifically addresses "restricted property,"

-10-

which may be consistent with St. Louis's acceptance of bailed property held by the Transportation Museum. See, e.g., Sgro v. Getty Petroleum Corp., 854 F. Supp. 1164,1175-76 (D.N.J. 1994). On this record we cannot, for example, say whether the Transportation Museum's failure to list No. 952 may affect the bailment or the obligations of St. Louis. Cf. Bollman Bros. Co. v. Peake, 69 S.W. 1058, 1059 (Mo. Ct. App. 1902) (discussing impact of conduct inconsistent with bailment on statute of limitations for action in replevin).

## IV.

In sum, the Historical Society has demanded No. 952's return and St. Louis resists, relying on its possession of the locomotive by a "permanent loan." But in the case of old loans to museums "[n]othing is permanent in this wicked world — not even our troubles." Monsieur Verdoux (Charles Chaplain Productions 1947); cf. Mead v. Ballard, 74 U.S. 290, 294 (1868) (discussing the legal implications of the term 'permanent'). Because the district court did not address the express or implied bailment of No. 952 for an indefinite period, the absence of any other written contract governing the loan and St. Louis's possession cannot alone resolve Lackawanna's action in replevin.

Accordingly, the case is remanded to the district court for further proceedings consistent with this opinion.

_____